UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GYM DOOR REPAIRS, INC., ET AL.,

                 Plaintiffs,

     - against -

YOUNG EQUIPMENT SALES, INC., ET AL.,

                 Defendants.

15-cv-4244 (JGK)

OPINION AND ORDER

JOHN G. KOELTL, District Judge:

The plaintiffs Gym Door Repairs, Inc. ("GDRI") and Safepath Systems LLC ("SPS") (together, the "plaintiffs") brought this suit against nineteen defendants to obtain permanent injunctive relief, damages, and attorneys' fees and costs for the defendants' alleged infringement of the plaintiffs' patent, copyrights, and trademarks, and -- under New York State law -- for unfair competition, tortious interference with business relationships, and civil conspiracy. The plaintiffs assert that the defendants have illegally inspected, maintained or repaired safety systems for electrically operated folding partitions, called the "Safe Path System," that the plaintiffs sold to New York State schools.

In 2015, the defendants filed motions to dismiss. In an Opinion and Order dated September 9, 2016, the Court dismissed the following defendants from the case: Dennis Schwandtner, New York State School Facilities Association, School Facilities

Management Institute, Nassau County BOCES, New York City Department of Education, Richard Young, and Brian Burke. Gym Door Repairs, Inc. v. Young Equip. Sales, Inc., 206 F. Supp. 3d 869, 917 (S.D.N.Y. 2016) ("Gym Door I").[1] The Court also dismissed some of the claims against the remaining defendants.

The Court denied motions for reconsideration filed by the defendant Thurnau and the plaintiffs, but allowed the plaintiffs to file a Third Amended Complaint. Gym Door Repairs, Inc. v. Young Equip. Sales, Inc., No. 15cv4244, 2016 WL 6652733, at *1 (S.D.N.Y. Nov. 10, 2016). Only one defendant, ESBOCES, filed a motion to dismiss the Third Amended Complaint. In a Memorandum Opinion and Order dated March 8, 2017, the Court dismissed the tortious interference claim against ESBOCES but denied the motion to dismiss the civil conspiracy claim. Gym Door Repairs, Inc. v. Young Equip. Sales, Inc., No. 15cv4244, 2017 WL 933103, at *1 (S.D.N.Y. Mar. 8, 2017).

---

[1] The plaintiffs and Educational Data Services, Inc. entered into a settlement agreement prior to the Court's decision on the motion to dismiss. Gym Door I, 206 F. Supp. 3d at 885 n.1.

The following claims and defendants remain in this case:

| Defendant | Outstanding Claim(s) |
|---|---|
| Young Equipment Sales, Inc. and YES Service and Repairs Corporation (together, the "Young Defendants") | • Tortious interference<br>• Civil conspiracy<br>• Copyright infringement |
| Eastern Suffolk BOCES ("ESBOCES") | • Civil conspiracy<br>• Copyright infringement |
| Bellmore Public Schools ("Bellmore") | • Copyright infringement |
| Total Gym Repairs, Inc. ("Total Gym Repairs") | • Tortious interference<br>• Trademark infringement and unfair competition |
| Carl Thurnau | • Tortious interference<br>• Civil conspiracy |
| Tri-State Folding and Peter Mucciolo (together, the "Tri-State Defendants") | • Tortious interference<br>• Copyright infringement<br>• Trademark infringement and unfair competition |
| Guardian Gym Equipment, Qapala Enterprises, Inc., and James Petriello (together, the "Guardian Defendants") | • Tortious interference<br>• Copyright infringement<br>• Trademark infringement and unfair competition |

All remaining defendants have moved for summary judgment on all outstanding claims against them, with the exception of the Young Defendants, who have not moved for summary judgment on the claim of copyright infringement against them.

For the following reasons, the motions for summary judgment are **granted.**

# I.

The standard for granting summary judgment is well established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224. The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable

inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); see also Gallo, 22 F.3d at 1223. Summary judgment is improper if any evidence in the record from any source would enable a reasonable inference to be drawn in favor of the nonmoving party. See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994). If the moving party meets its burden, the nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993). See also Wesley-Dickson v. Warwick Valley Cent. Sch. Dist., 973 F. Supp. 2d 386, 390-91 (S.D.N.Y. 2013), aff'd, 586 F. App'x 739 (2d Cir. 2014).

## II.

The plaintiffs in this action are GDRI and SPS. Stephen and Kathleen Cole are the sole owners of GDRI and SPS. Thurnau Rule 56.1 ¶ 8. GDRI was incorporated in or about 1977. ESBOCES Rule 56.1 ¶ 1. GDRI performs maintenance, installation, and repair of electrically operated partition doors ("EOPs") and related safety devices for school gyms. ESBOCES Rule 56.1 ¶ 2.

In 2001, after unattended EOPs caused at least two fatal accidents, New York State enacted Education Law § 409-f. The law requires that every EOP:

> be equipped with safety devices which, subject to standards established in rules and regulations promulgated by the commissioner, stop the forward motion of the partition or room divider and stop the stacking motion of the partition or room divider when a body passes between the leading panel of such partition or divider and a wall, or when a body is present in the stacking area of such partition or divider.

Educ. Law § 409-f(3).

After the enactment of Education Law § 409-f, GDRI developed a safety device that could be installed on EOPs to bring the EOP into compliance with the law. The safety device stops the door from moving forward or backward if it senses an obstruction in its path (the "Safe Path System"). Thurnau Rule 56.1 ¶ 13. Beginning in 2003 -- and largely in 2003 and 2004 -- Gym Door installed Safe Path Systems in schools all over New York State. Thurnau Rule 56.1 ¶ 16.

This lawsuit concerns the maintenance of these Safe Path Systems. Broadly, the plaintiffs argue that the regulation implementing Education Law § 409-f -- 8 N.Y.C.R.R. § 155.25 ("Regulation 155.25") -- requires that the maintenance of Safe Path Systems be accomplished only by the plaintiffs or by technicians that are authorized to work on Safe Path Systems by the plaintiffs. They argue that the defendants have ignored

Regulation 155.25 and interfered with the plaintiffs' right to maintain the Safe Path Systems that they installed.

Regulation 155.25 was adopted in October 2002. Thurnau Rule 56.1 ¶ 2. Regulation 155.25 sets forth requirements for the construction, maintenance, and operation of the safety devices that are required to be installed on EOPs. Regulation 155.25(c), (d). With respect to the maintenance of the safety equipment, Regulation 155.25 states: "All equipment must be maintained in accordance with the manufacturer's instructions, including the manufacturer's recommended service interval, and records of such maintenance shall be permanently retained at the district or private school." Regulation 155.25(d)(4).

The manufacturer's instructions for the Safe Path Systems "require the use of certified technicians to maintain and repair SAFE PATH systems." Pls.' Response to ESBOCES Rule 56.1 ¶ 100; see also Pls.' Response to Thurnau Rule 56.1 ¶ 38. The plaintiffs argue that, because of this language in their manufacturer's instructions, Safe Path Systems must be maintained by either SPS or GDRI, or another dealer that is authorized by SPS or GDRI to complete the maintenance. See, e.g., Pls.' Response to Thurnau Rule 56.1 ¶¶ 37-38; Pls.' Response to Young Rule 56.1 ¶ 26.

The defendants dispute that this is the proper interpretation of Regulation 155.25 and they deny that the Regulation requires schools to hire the plaintiffs or their authorized technicians to maintain the Safe Path Systems. See, e.g., Thurnau Rule 56.1 ¶ 32. The defendants argue that any competent individual may maintain an EOP in accordance with the manufacturer's requirements. Thurnau Rule 56.1 ¶ 25.

Relying on their disputed interpretation, the plaintiffs claim that the defendants in this case have -- in various ways -- interfered with the plaintiffs' right under the Regulation to maintain and service the Safe Path Systems and have infringed on the plaintiffs' copyrights relating to the Safe Path System.

First, the plaintiffs have sued four competitors: the Young Defendants, Total Gym Repairs, the Guardian Defendants, and the Tri-State Defendants. Generally, the plaintiffs allege that these competitors have serviced and maintained -- and sought to service and maintain -- Safe Path Systems in violation of Regulation 155.25. The competitors argue that Regulation 155.25 does not prohibit them from maintaining and servicing Safe Path Systems, and they are merely competing with the plaintiffs for that work and have done nothing improper by seeking bids to complete that work.

Second, the plaintiffs have sued ESBOCES, an educational cooperative that provides programs and services to public school

districts in Suffolk County, New York. ESBOCES Rule 56.1 ¶ 8.
ESBOCES runs a cooperative bidding program that allows school
districts to coordinate some or all of their bidding needs by
cooperatively bidding for goods and services. ESBOCES Rule 56.1
¶ 180. The plaintiffs claim that ESBOCES conspired with the
Young Defendants to interfere with the plaintiffs' prospective
business relationships to maintain the Safe Path System in
schools associated with ESBOCES. They allege that the Young
Defendants submitted illegal bids to ESBOCES, and ESBOCES
awarded contracts to the Young Defendants under those bids,
knowing they were illegal. ESBOCES and the Young Defendants
dispute these allegations.

Third, the plaintiffs have sued a state official, Carl
Thurnau. Mr. Thurnau was the Director of the Office of
Facilities Planning for the NYSED from November 1999 to August
2016. Thurnau Rule 56.1 ¶ 5. The Office of Facilities
Planning oversees the safety of EOPs and was primarily
responsible for drafting the implementing regulation. The
plaintiffs allege that Thurnau retaliated against them for
reporting noncompliance of public schools with maintaining the
Safe Path Systems. Pls.' Response to Thurnau Rule 56.1 ¶¶ 44-
52. They allege that Thurnau repeatedly announced that
Regulation 155.25 did not require service of Safe Path Systems
to be completed by SPS approved technicians, and that this

interfered with their business.  Pls.' Response to Thurnau Rule
56.1 ¶ 25.  Thurnau disputes these allegations.  He argues that
his office's interpretation of Regulation 155.25 -- that any
competent person can maintain the Safe Path Systems -- is
correct and that he did nothing improper by announcing that
interpretation to the public schools.

Finally, the plaintiffs have sued Bellmore Public Schools
for copyright infringement.  The plaintiffs allege that an
employee of Bellmore, Joseph Hendrickson, took copyrighted Safe
Path instruction materials, altered them, and used them as part
of bid invitation materials.  Bellmore Rule 56.1 ¶ 129.
Bellmore argues that it was entitled to fair use of the
materials.

The plaintiffs have previously filed two lawsuits regarding
generally the same underlying issues at issue in this case.

First, in March 2011, the plaintiffs commenced an Article
78 proceeding in New York State Supreme Court.  The plaintiffs
sought an order requiring the New York State Department of
Education to inspect, service and maintain all safety systems in
accordance with Educational Law § 609-f and Regulation 155.25.
Gym Door Repairs, Inc. v. N.Y.C. Dep't of Educ., 977 N.Y.S.2d
478, 479-80 (App. Div. 2013).  The New York State Supreme Court
dismissed the case and the Appellate Division, Third Department
affirmed.  Id. at 480.  The Appellate Division held that the

plaintiffs lacked standing because they "were essentially asserting a general challenge to respondents' administration of the relevant statute and regulation" and because "their asserted injuries [we]re too speculative and conjectural to satisfy the injury-in-fact requirement." Id. The Court further found that "the purpose of the law [§ 409-f] was to protect primarily students and not individuals paid to work specifically on the safety devices." Id. (citations omitted).

Second, in October 2012, the plaintiffs commenced an action in this Court against the New York City Department of Education and several state officials, alleging violations of their due process rights and First Amendment retaliation. Gym Door Repairs, Inc. v. N.Y.C. Dep't of Educ., No. 12cv7387, 2013 WL 4934868, at *2 (S.D.N.Y. Sept. 10, 2013). In that case, the plaintiffs argued that the combined effect of Education Law § 409-f, Regulation 155.25, and their manufacturer's instructions gave them a property interest in installing and maintaining EOPs in all New York City schools and that the defendants had deprived them of that property interest without due process. Id. at *2. Judge Sweet dismissed the plaintiffs' complaint for failure to state a claim. With respect to the due process claims, the Court found that Regulation 155.25 did not confer on the plaintiffs the right to maintain all Safe Path Systems and therefore that they held no property interest that

11

the defendants had interfered with.  Id. at *5.  The Second

Circuit Court of Appeals affirmed the dismissal of the due

process claims.  Safepath Systems LLC v. N.Y.C. Dep't of Educ.,

563 F. App'x 851, 855 (2d Cir. 2014).[2]

### III.

There are two issues that bear on the outcome of these

motions with respect to all or nearly all of the defendants.

Those issues are therefore addressed initially.  The first issue

concerns the proper interpretation of Regulation 155.25.  The

second concerns the plaintiffs' claim for damages.

### A.

The plaintiffs' claims in this case depend, in large part,

on their interpretation of Regulation 155.25.  The plaintiffs

argue that the Regulation, read in combination with their

manufacturer's instructions, requires that all Safe Path Systems

be serviced and maintained by the plaintiffs or a Safe Path

authorized technician.  The plaintiffs assert that the

defendants have caused them harm by attempting to violate -- and

violating -- this Regulation and interfering with the

plaintiffs' ability to maintain their Safe Path Systems as

required by the Regulation.

---

[2] The Court of Appeals vacated and remanded the dismissal of the
First Amendment retaliation claim.

The defendants argue that this Court is bound by the prior decision of Judge Sweet that interpreted Regulation 155.25 and rejected the plaintiffs' proposed interpretation.

"The doctrine of collateral estoppel ('or issue preclusion') bars relitigation of a specific legal or factual issue in a second proceeding where (1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was [a] full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits." Grieve v. Tamerin, 269 F.3d 149, 153 (2d Cir. 2001) (citation and internal quotation marks omitted); see also Gym Door I, 206 F. Supp. 3d at 917; Rullan v. N.Y.C. Sanitation Dep't, No. 13cv5154, 2013 WL 4001636, at *2 (S.D.N.Y. Aug. 6, 2013), aff'd, 607 F. App'x 86 (2d Cir. 2015).

In his prior ruling, Judge Sweet held:

> The Complaint has also failed to establish that Plaintiffs have a right to be awarded a public contract or to subcontract on a public contract. In cases of contracting, government officials have a "significant discretion" over "the continued conferral of [a] benefit, [and thus] it will be rare that the recipient will be able to establish an entitlement to that benefit." Kelly Kare Ltd. v. O'Rourke, 930 F.2d 170, 175 (2d Cir. 1991); see also Town of Castle Rock v. Gonzales, 545 U.S. 748, 756; RR Village Ass'n, Inc. v. Denver Sewer Corp., 826 F.2d 1197, 1202 (2d Cir. 1987). Moreover, under New York law, DOE may only

award contracts to the lowest responsible bidder. GML § 103, Educ. Law §§ 2556(10), 2556(10-a).

In the face of these well-established norms and laws regarding the awarding of government contracts, the mere fact that Plaintiffs unilaterally inserted language in their own maintenance instructions that expressly preclude anyone other than Plaintiffs from performing the maintenance, see Compl. ¶ 38, cannot have the effect of requiring Defendants to enter into a sole-source relationship with Plaintiffs. Accordingly, the language in the Regulation requiring that "[a]ll equipment must be maintained in accordance with the manufacturer's instructions" must be understood as mandating conformity with the methods and procedures prescribed by the manufacturer, rather than commanding that the manufacturer be vested with the power to determine vendor selection. See Dairymen's League Coop. Ass'n v. Brannan, 173 F.2d 57, 66 (2d Cir. 1949) (holding that "when alternative interpretations [of an administrative regulation] are possible, the more reasonable of the two is to be chosen ...").

Gym Door Repairs, 2013 WL 4934868, at *5.

This Court is bound by Judge Sweet's interpretation of Regulation 155.25. Judge Sweet was considering the identical issue in the prior action, namely whether Regulation 155.25 established that the plaintiffs "had a right to be awarded a public contract or to subcontract on a public contract." Id. at *2. The issue was fully and fairly litigated on a motion to dismiss in the case before Judge Sweet. Relying on his interpretation of Regulation 155.25, Judge Sweet granted the defendants' motion, resulting in the dismissal of the plaintiffs' due process claims. The Second Circuit Court of Appeals upheld Judge Sweet's decision dismissing the procedural

14

due process claims on the ground that the plaintiffs had not demonstrated that they held any property interest. See Safepath Sys. LLC, 563 F. App'x at 855 ("Because plaintiffs did not possess a cognizable property interest in the Safe Path System being installed in all City schools or in maintaining those that were installed, their procedural due process claim was properly dismissed."). This Court is therefore bound by Judge Sweet's prior interpretation of Regulation 155.25, which held that the plaintiffs cannot unilaterally require that all Safe Path Systems be maintained by Safe Path authorized technicians by including language to that effect in their manufacturer's instructions. Regulation 155.25 does not require such a monopoly. Rather, Regulation 155.25 requires only that technicians servicing Safe Path Systems conform to the methods and procedures for maintenance set forth in the Safe Path manufacturer's instructions.

The plaintiffs argue that this Court, in its decision denying the motions to dismiss, already determined that the claims in this case were different from those before Judge Sweet and therefore collateral estoppel did not apply. However, in that motion, the Court was asked to decide whether collateral estoppel applied to bar certain claims on a motion to dismiss. Here, the defendants argue that collateral estoppel bars this Court from relitigating a specific issue that was already

15

decided by Judge Sweet, namely the proper interpretation of Regulation 155.25. Accordingly, the Court did not decide in its decision on the motion to dismiss that collateral estoppel did not apply to the interpretation of Regulation 155.25.

**B.**

The plaintiffs have also failed to present any evidence from which a reasonable jury could find that they suffered any damages from any of the claims they have asserted against the defendants.

As an initial matter, the plaintiffs' damages theory -- to the extent any theory can be ascertained from the plaintiffs' disclosures[3] -- rests entirely on their flawed interpretation of Regulation 155.25 to the effect that they are entitled to all contracts to maintain and service Safe Path Systems. The plaintiffs calculate their damages by assuming that they would have serviced and maintained <u>all</u> Safe Path Systems but for the defendants' interference and therefore are entitled to recover

---

[3] The plaintiffs state in their opposition brief that their damages theory is "exactly the same as it was at the very beginning of the litigation" -- but they fail to state what that theory is. In response to an initial interrogatory request by Thurnau, on December 30, 2016, the plaintiffs stated that their damages "are equal to the total number of Safe Path Systems installed (approximately 4,700), minus the number of devices being maintained by Plaintiffs (approximately 207)[,] times the annual maintenance ($600) and average cost of repairs ($1,200) per system[,] times the number of years of interference (7)." Daniels Ex. 171, at ¶ 2 (Docket No. 621-16).

lost profits for the service and/or maintenance of any Safe Path Systems they did not win a contract to service. But, as discussed above, the plaintiffs' interpretation of Regulation 155.25 is incorrect -- the plaintiffs do not have a right to service and maintain all Safe Path Systems and therefore cannot calculate damages relying on an assumption that they do. The plaintiffs have not put forth any theory of damages other than one relying on their flawed interpretation of Regulation 155.25. The plaintiffs have presented no evidence that they would have successfully obtained contracts to service and maintain any Safe Path Systems that they did not service. The plaintiffs therefore have no evidence of damages.

Moreover, even if the plaintiffs had a plausible theory of damages, the plaintiffs have no viable way to prove damages because nearly all of their evidence relating to damages was excluded as a result of the plaintiffs' discovery violations. At a hearing held on November 27, 2017, this Court adopted sanctions imposed by the Magistrate Judge for the plaintiffs' discovery failures and abuses. Those rulings: precluded the plaintiffs' damages expert from testifying and struck his report; precluded the plaintiffs' customer ledger, invoices, and list of New York City Safe Path Systems; precluded Stephen Cole from testifying about damages; and struck the plaintiffs' third

amended initial disclosures, which set forth a damages'
estimate. Nov. 27, 2017 Hr'g Tr. 8-13 (Docket No. 497).

The plaintiffs argue that they can still establish damages
using "evidence that was produced on time (e.g., the NYSED
records, Plaintiffs['] customer ledgers, [and] the deposition
testimony of Stephen and Kathleen Cole), and the trial testimony
of Kathleen Cole." Pls.' Opp. Br. 62-63. But the plaintiffs'
general assertion that they can prove damages using this
evidence is insufficient. The plaintiffs do not provide any
citations to documents or portions of deposition transcripts
that provide support for their damages. They simply do not
explain how this evidence will enable them to prove their
damages and allow a reasonable jury to determine that they
suffered any quantifiable damage.

The fact that plaintiffs' damages estimates wildly
vacillated over the course of this litigation is further
evidence that the plaintiffs' have not set forth a reliable
theory of damages. The plaintiffs' damages estimate in its
initial disclosures, dated November 10, 2016, was $66,100,000.
Kleinberg Decl. Ex. W, at 8 (Docket No. 547-48). The second
amended disclosures also provided a damages estimate of

$66,100,000.  Kleinberg Decl. Ex. XXX (Docket No. 547-103).[4]  In a report dated September 11, 2017, the plaintiffs' damages expert at the time, Paul Ribaudo, provided a damages estimate of $534,189.  Gold Decl. Ex. Q, at 2 (Docket No. 456-20).  In their third amended disclosures, served September 25, 2017,[5] the plaintiffs provided a damages estimate of $3,905,959.26.  Soter Decl. Ex. LL (Docket No. 552-38).  The plaintiffs have provided no explanation for how they could have reduced their damages calculation from over $60,000,000 to somewhat less than $4,000,000 over the course of the litigation, and have failed to reconcile it with their expert at the time, who came up with a damages estimate of about $500,000.  The plaintiffs plainly have failed to present evidence from which a reasonable jury could find that they have any damages.

Further, the plaintiffs have also failed to comply with the Federal Rules of Civil Procedure with respect to disclosure of their damages, and their failure to do so was not harmless.

--------

[4] While this disclosure is dated August 7, 2016, the date is apparently a typographical error because this disclosure should follow the initial disclosure on November 10, 2016.

[5] While the third amended initial disclosures are dated August 7, 2016, that is plainly a typographical error, because that is the same date as the second amended initial disclosures.  According to a letter on the docket from ESBOCES to Magistrate Judge Peck, the third amended initial disclosures were served on September 25, 2017.  Docket No. 401.

This failure warrants preclusion of any evidence by the plaintiffs relating to damages.

Rule 26 of the Federal Rules of Civil Procedure requires parties to provide to opposing counsel: "a computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered." Fed. R. Civ. P. 26(a)(1)(A)(iii). Rule 37(c)(1) of the Federal Rules of Civil Procedure provides in relevant part: "If a party fails to provide information . . . as required by Rule 26(a) . . . , the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless."

On November 11, 2016, the plaintiffs provided their Initial Disclosures pursuant to Federal Rule of Civil Procedure 26. Kleinberg Decl. Ex. W (Docket No. 547-48). The disclosures set forth estimated damages of $66,100,000 for tortious interference, trademark infringement, unfair competition, and conspiracy. They allotted $21,000,000 to "Interference with annual SAFE PATH maintenance and staff training Jan[.] 2010 to present"; $42,000,000 to "Interference with SAFE PATH and

partition repairs Jan. 2010 to present"; and $3,100,000 to "Interference with ESBOCES basketball backstop and bleacher bid." Id. at 8. The plaintiffs did not provide any background or methodology for how they came up with these estimates, nor did they cite to any documents as a basis for their computation.

In their second amended disclosures,[6] the plaintiffs again estimated damages at $66,100,000. Kleinberg Decl. Ex. XXX, at 9 (Docket No. 547-103). However, the sum of the amounts allotted to the different interferences ($20,130,600; $42,000,000; and "Unknown at this time") was only $62,130,600. Id. The plaintiffs did not provide any detail regarding how they came up with these damages estimates, nor did they explain in any way why the numbers had changed from their initial disclosures. Id.

The plaintiffs' third amended disclosures were struck by this Court. They set forth briefly a damages methodology that was based on the report by the plaintiffs' then expert, Paul Ribaudo, whose report was also subsequently stricken by this Court and who was precluded from testifying. Soter Decl. Ex. LL, at 9-10 (Docket No. 552-38). But because these disclosures were precluded, they cannot satisfy the plaintiffs' requirement under the Federal Rules to disclose the basis for their damages claim.

---

[6] The parties do not reference "first amended" initial disclosures in their papers.

In short, the plaintiffs failed to provide a coherent computation of damages from their initial imaginary computation of over $66,000,000 in damages through their ultimate bald assertion of somewhat less than $4,000,000. The plaintiffs also failed to provide the "documents or other evidentiary material . . . on which computation is based." Fed. R. Civ. P. 26(a)(1)(A)(iii). The plaintiffs thus violated Federal Rule of Civil Procedure 26(a)(1)(A)(iii). Accordingly, the plaintiffs should not be permitted to introduce any evidence of damages pursuant to Federal Rule of Civil Procedure 37(c)(1). Under Rule 37(c)(1), this is not a case where the failure to make disclosure was "substantially justified or is harmless." There is no plausible explanation for the plaintiffs' dilatory actions in formulating their damages computations and failing to produce supporting documentation.

Moreover, the disclosure failures were not harmless. The plaintiffs' failure to produce any detail regarding their methodology for computing damages prevented the defendants from obtaining discovery regarding the alleged damages and has hindered the defendants' ability to prepare a defense to the plaintiffs' claim for damages.

In determining whether to preclude evidence under Rule 37(c)(1), the Court should exercise its sound discretion. See Design Strategy, Inc. v. Davis, 469 F.3d 284, 297 (2d Cir.

2006). To determine whether preclusion should be applied under Rule 37(c)(1) in the exercise of discretion, the Court should consider: "(1) the party's explanation for the failure to comply with the [disclosure requirement]; (2) the importance of the . . . precluded [evidence]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new [evidence]; and (4) the possibility of a continuance." Id. at 296 (first alteration in original) (internal quotation marks omitted) (quoting Patterson v. Balsamico, 440 F.3d 104, 117 (2d Cir. 2006)). In this case, these factors point decidedly toward preclusion.

First, the plaintiffs have provided no satisfactory explanation for their failure to provide a plausible computation of damages and the evidence to support it. The plaintiffs assert that they provided the required disclosure in response to Thurnau's First Set of Interrogatories. But in that response, the plaintiffs state only that their damages "are equal to the total number of Safe Path Systems installed (approximately 4,700), minus the number of devices being maintained by Plaintiffs (approximately 207)[,] times the annual maintenance ($600) and average cost of repairs ($1,200) per system[,] times the number of years of interference (7)." Daniels Ex. 171, at ¶ 2 (Docket No. 621-16). This response is plainly insufficient. The plaintiffs do not explain in any way how they devised the

numbers they inputted into this formula. They do not provide any citations to documents or testimony that supports their estimate of the number of Safe Path Systems; the number of Safe Path Systems being maintained by the plaintiffs; the cost of annual maintenance or repairs; or the number of years of interference. The plaintiffs cannot simply assert these numbers that provide the basis for their damages calculation without providing any explanation as to how they devised them, or citing to any documents that support them. Rule 26 requires the plaintiffs to provide disclosure of the documents or other evidentiary material on which their damages computations were based. The plaintiffs failed to do so.

While evidence of damages is plainly important, in this case the plaintiffs' evidence of damages has already been independently precluded because of the plaintiffs' numerous discovery abuses found by the Magistrate Judge, which this Court affirmed.

The defendants would plainly be prejudiced if they were required to meet any new evidence of damages because it would require wholly new computations of damages, new evidence, and reopening discovery after extensive motions for summary judgment have been filed. That would be unreasonably prejudicial to the defendants. Similarly, a continuance would not solve the

problems with the plaintiffs' failure to disclose computations of damages and supporting documentation.

This is therefore a case in which the plaintiffs' damages evidence -- whatever it may be -- is properly excluded under Rule 37(c)(1). The plaintiffs' failure to comply with their disclosure requirements with respect to damages calculations and supporting evidence under Rule 26(a) was egregious. The failure was compounded by the wildly inflated initial computation of $66,100,000 in damages, ultimately reduced to somewhat less than $4,000,000, which itself was undermined by the plaintiffs' ultimately excluded expert witness. Preclusion in the Court's discretion is wholly justified under Rule 37(c)(1). See, e.g., Design Strategy, 469 F.3d at 299; Spotnana, Inc. v. Am. Talent Agency, Inc., No. 09cv3698, 2010 WL 3341837, at *2 (S.D.N.Y. Aug. 17, 2010).

Therefore, for the various reasons provided above, the plaintiffs have not set forth a plausible damages theory and have not offered any evidence from which a reasonable jury could find that they suffered any damages. With the exception of a claim for statutory damages for copyright infringement, all of the plaintiffs' claims must be dismissed for lack of evidence of any damages that they allegedly suffered.

## IV. Tortious Interference

The Young Defendants, Thurnau, Total Gym Repairs, the Tri-State Defendants, and the Guardian Defendants have moved for summary judgment on the plaintiffs' claims for tortious interference with prospective business relations.

### A. Standard

"Under New York law, to state a claim for tortious interference with prospective economic advantage, the plaintiff must allege that '(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship.'" Kirch v. Liberty Media Corp., 449 F.3d 388, 400 (2d Cir. 2006) (quoting Carvel Corp. v. Noonan, 350 F.3d 6, 17 (2d Cir. 2003), certified question answered, 818 N.E.2d 1100 (N.Y. 2004)). In addition, the defendant's interference must be direct. The defendant must target some activities directed toward the third party and convince the third party not to enter into a business relationship with the plaintiff. Fonar Corp. v. Magnetic Resonance Plus, Inc., 957 F. Supp. 477, 482 (S.D.N.Y. 1997); see also Gym Door I, 206 F. Supp. 3d at 907-08.

The statute of limitations for tortious interference with business relationships is generally three years. See Antonios A.

*Alevizopoulos & Assocs., Inc. v. Comcast Int'l Holdings, Inc.*,
100 F. Supp. 2d 178, 183 (S.D.N.Y. 2000) (citing N.Y. C.P.L.R.
§ 214(4)); *Gym Door I*, 206 F. Supp. 3d at 910.

1.

To establish the first element of a claim for tortious
interference with a prospective business relationship, the
plaintiffs must demonstrate that they had a reasonable
probability of entering into a business relationship with a
third party.  See *BDCM Fund Adviser, L.L.C. v. Zenni*, 962
N.Y.S.2d 11, 15 (App. Div. 2013) (noting the need to allege a
"reasonable probability of a business relationship" for the tort
of tortious interference with prospective business relations).

The plaintiffs argue that they have a prospective business
relationship to maintain and service those systems with all
schools that have installed a Safe Path System.  See Pls.' Opp.
Br. 17 ("All of these installations, which are clearly
documented in the record in this case, constitute prospective
business relationships for SAFE PATH maintenance and repair.").
To identify which schools are their prospective business
partners, the plaintiffs rely on their own customer ledgers, as
well as official records they have subpoenaed from the NYSED
which identify in what schools Safe Path Systems were installed.
They argue that, because Regulation 155.25 requires Safe Path
Systems to be serviced only by the plaintiffs or their

authorized technicians, they have a prospective business relationship which each of these schools to perform maintenance on the school's Safe Path Systems.

But, of course, this argument rests on the flawed premise that Regulation 155.25 requires that Safe Path Systems can only be maintained by the plaintiffs or their authorized technicians. As discussed above, that interpretation is incorrect. Accordingly, the plaintiffs cannot rely on that Regulation to establish that they had a prospective business relationship with every school that has a Safe Path System. Installation of the Safe Path System alone is not enough to establish that the plaintiffs have a prospective relationship to maintain that system. The plaintiffs must demonstrate that they had a reasonable probability of obtaining the contracts to maintain those systems rather than their competitors.

The plaintiffs have offered no evidence that they had a reasonable probability of entering into maintenance or repair contracts with any school districts other than those for whom they actually did such work. The jury could not rely on speculation by the plaintiffs which is refuted by the plaintiffs' failure to obtain any additional contracts.

Accordingly, the plaintiffs have not demonstrated that they have any prospective business relationships.

To establish the second element of tortious interference, the plaintiffs must establish that the defendants knew of the relationship and intentionally interfered with it. 4 K & D Corp. v. Concierge Auctions, LLC, 2 F. Supp. 3d 525, 546–47 (S.D.N.Y. 2014).

The plaintiffs argue that the defendants had knowledge of the prospective business relationships between the plaintiffs and the schools because the defendants had knowledge of where Safe Path Systems were installed. See Pls.' Opp. Br. 18 (Thurnau signed off on most of the installations of the Safe Path Systems); id. (an employee of Total Gym Repairs, Mr. Ramotar, was employed by GDRI for more than sixteen years as a Safe Path technician); id. at 19 (the Young Defendants and Tri-State defendants "had access to information regarding the location of SAFE PATH installations" because they were briefly authorized Safe Path dealers); id. (an employee for the Guardian Defendants, James Petriello, is aware of where some Safe Path Systems are because he testified that he has installed and worked on Safe Path Systems in the past).

But the plaintiffs did not have a business relationship with all the schools simply because the schools had installed a Safe Path System at some time. Accordingly, knowledge of the location of Safe Path Systems does not substitute for knowledge

of specific prospective business relationships, because the plaintiffs do not have a prospective business relationship with every school that has installed a Safe Path System. The plaintiffs do not offer any evidence to support a finding that any of the defendants were aware of any bids placed by the plaintiffs at any specific schools to maintain the Safe Path Systems or were aware of any other specific prospective business relationships between the plaintiffs and any school that derived from more than the Regulation. See 4 K & D Corp., 2 F. Supp. 3d at 546-47 ("[I]n order to state a claim for tortious interference, there must be a particular business relationship between the plaintiff and the third party, [the] defendants must have actual knowledge of that specific relationship, and . . . the interference must be intentional, not negligent.").

### 3.

To establish the third element of tortious interference, the plaintiffs must demonstrate that the defendants acted solely out of malice or used improper or illegal means that amounted to a crime or independent tort. Gym Door I, 206 F. Supp. 3d at 907.

**Thurnau:** The plaintiffs include a laundry list of allegations in their papers that they contend show that Thurnau used improper or illegal means to interfere with their

prospective business relationships with schools to service or maintain their Safe Path Systems. See Pls.' Opp. Br. 21-28.

Nearly all of these allegations concern events that are barred by the statute of limitations because they occurred prior to June 2, 2012 -- three years before the plaintiffs filed the current lawsuit on June 2, 2015. Some of these events occurred long before June 2, 2012. For example, the plaintiffs cite to an email sent by Thurnau on July 7, 2009 and a memo issued by Thurnau in August 2009. See Daniel Decl. Exs. 113 (Docket No. 619-13) and 144 (Docket No. 620-14).

Moreover, some of the allegations are plainly unsupportive of -- and unrelated to -- a claim for tortious interference and are, frankly, peculiar. For example, the plaintiffs argue that Thurnau "prevented Gerald Couse from testifying at the TRO hearing in this case on August 2, 2015 because Couse's testimony would be damaging. Couse died unexpectedly a few months later and was never able to testify." Pls.' Opp. Br. 27.[7] The plaintiffs also argue that Thurnau "sabotaged the settlement conference before Magistrate Judge Peck by portraying Plaintiffs to the Judge as conspiracy theorists, monopolists and golddiggers. Coming from the Attorney General's Office, these

_____

[7] Thurnau points out that the Court permitted the plaintiffs to call Couse as a witness but the plaintiffs' counsel said: "We have decided we do not need to do that." (Docket No. 219 at 11, 13, 118).

false and defamatory allegations carried special weight." Id.
at 28. These allegations -- which relate to the conduct of
Thurnau's counsel in this litigation -- do not support a claim
that Thurnau tortiously interfered with the plaintiffs'
prospective business relationships.

Setting aside all of the allegations that are barred by the
statute of limitations or are otherwise clearly meritless, the
plaintiffs have offered only five alleged instances of wrongful
conduct by Thurnau. In none of them did Thurnau do anything
illegal or improper, or anything other than conduct himself
properly as a state official.

The plaintiffs argue that Thurnau interfered with a
potential contract with Middle Country Central School District
("Middle Country") in April 2016 by discouraging Middle Country
from entering into a sole source contract with the plaintiffs
for the inspection, repair, and maintenance of the Safe Path
Systems. But Thurnau's communication with Middle Country was
not improper or illegal.

In 2016, Middle Country put out a public, competitive bid
for maintenance of the Safe Path Systems. Fiorino Decl. ¶ 3
(Docket No. 518). The plaintiffs submitted a bid, but it was
not the lowest bid and thus the plaintiffs were not awarded the
contract. Id. ¶ 4. Subsequently, Stephen Cole contacted Middle
Country and explained that the plaintiffs were entitled to a

sole source contract under the New York State regulations.  Id.
¶ 5.  After this call, Middle Country emailed the NYSED to ask
if the plaintiffs were in fact entitled to a sole source
contract.  Id. ¶ 6.  In response, Thurnau referred Middle
Country to Regulation 155.25 and explained that the NYSED
interpretation of that regulation did not require schools to
contract with the plaintiffs for the maintenance of the Safe
Path Systems.  Id. ¶ 6 & Ex. A.  Thurnau also referred Middle
Country to a newsletter he had previously issued which explained
Regulation 155.25.  Id. at Ex. A.

    Thurnau's communication with Middle Country was not
improper or illegal.  Thurnau simply conveyed to a school
district -- who had sought out a clarification -- the NYSED's
interpretation of Regulation 155.25.  That interpretation at the
time had been endorsed by a Judge of this Court as well as the
Second Circuit Court of Appeals.  All of Thurnau's statements in
the email were truthful.  This communication is therefore
plainly not supportive of a finding that Thurnau acted solely
out of malice or used improper or illegal means to interfere
with the plaintiffs' prospective business relationships.  It is
in fact evidence that Thurnau was simply doing his job.

    The incident also highlights the deficiencies in the
plaintiffs' evidence.  They have failed to show that they lost
prospective business relationships with school districts because

of the alleged interference by any of the defendants as opposed to their failure to submit the lowest competitive bids for prospective business.

The plaintiffs also argue that Thurnau interfered with their prospective business relationships when he issued two newsletters in 2015 that discussed EOPs, Education Law § 409-f, and Regulation 155.25.

The June 2015 newsletter contained an article that quoted a short portion of Education Law § 409-f and informed readers that the statutory provision applied to private and public schools. Docket No. 91-11; see also Thurnau 56.1 ¶¶ 62-63. The August 2015 newsletter contained an article warning of a possible gap in coverage by safety devices in the pocket or stacking area of EOPs. Docket No. 512-39; see also Thurnau Rule 56.1 ¶ 69. Neither newsletter mentions SPS or GDRI. Thurnau Rule 56.1 ¶¶ 64, 71. The articles also do not discuss Regulation 155.25 or the maintenance of Safe Path Systems.

The plaintiffs argue that the June 2015 newsletter was improper because Thurnau "neglected to include any substantive information about Ed. Law 409-f [which was] a deliberately missed opportunity to provide much needed education to school district officials, many if not most of whom are still unaware of the statutory and regulatory requirements for folding partitions." Pls.' Resp. to Thurnau Rule 56.1 ¶ 63 (Docket No.

575). This argument that Thurnau somehow acted improperly, illegally, or solely out of malice because of an apparent omission does not pass muster. The plaintiffs cannot argue that a state official is performing his job improperly just because they would have done it differently. Everything written in the newsletters was truthful.

With respect to the August 2015 newsletter, the plaintiffs argue that "anyone familiar with safety devices would know that the article was referring to Safe Path." Pls.' Response to Thurnau Rule 56.1 ¶ 71. This is entirely speculative and cannot support a claim that the newsletter was somehow intended to interfere with the plaintiffs' business relationships when it did not even mention the plaintiffs.

Lastly, the plaintiffs argue that Thurnau's email exchanges in 2013 and 2016 with an employee of the Young Defendants were improper. But these emails, again, did nothing more than convey the NYSED's interpretation of Regulation 155.25 in response to an inquiry from the employee. Daniels Decl. Ex. 156 (Docket 621-1) ("There is no monopoly on approvable systems. Any system that meets the legislation can and will be approved after review and approval by my staff."); Daniels Decl. Ex. 166 (Docket No. 621-11) ("The State has consistently interpreted our regulations to mean that any qualified individual can maintain folding partitions in accordance with the manufacturer's

instructions."). These statements were truthful and plainly not improper.

**Total Gym Repairs:** The plaintiffs argue that Total Gym Repairs has committed an independent tort that satisfies the wrongful conduct prong based on conduct by Mr. Ramotar, an employee of Total Gym Repairs. The plaintiffs allege that he violated a non-compete agreement he signed with GDRI, his former employer. Specifically, the plaintiffs allege that he sought to do business with Columbia University, New York University, and the Museum of Modern Art in violation of the non-compete. But none of those institutions have a Safe Path System. Total Gym Repairs 56.1 ¶¶ 195-97.[8] Therefore, any allegations that Mr. Ramotar violated his non-compete with respect to those entities is irrelevant to the tortious interference claim in this case, which is solely related to interference with the plaintiffs' alleged prospective business relationships to maintain Safe Path Systems. See Soter Decl. Ex. A at 3 (Docket No. 650-1) (at a

---

[8] The plaintiffs now assert that MOMA has a Safe Path System but indicate that the system was "recently installed." The plaintiffs do not explain how Mr. Ramotar could have interfered with the plaintiffs' prospective business relationship with MOMA when MOMA actually installed the plaintiffs' system recently. (Docket No. 576 at 45). In any event, Mr. Ramotar was a Safe Path certified technician for the period of 2004-2012. (Id. at 34). The plaintiffs allege that he had a two-year non-compete agreement with GDRI. Pls.' Opp. Br. 37. Thus, his action with respect to any recently installed system would not be covered by that agreement.

conference regarding discovery disputes, Magistrate Judge Peck noted, "As to the issue of the noncompete and Columbia/MOMA/NYU, the complaint clearly links it to the Safepath Systems").

The plaintiffs' remaining arguments that Total Gym Repairs wrongly interfered with the plaintiffs' business are premised on their claim that Total Gym Repairs is not allowed to work on Safe Path Systems and did so in violation of Regulation 155.25.[9] But Total Gym Repairs is not forbidden by Regulation 155.25 from maintaining Safe Path Systems and did nothing wrong by bidding for maintenance contracts and competing with the plaintiffs for that work. See 16 Casa Duse, LLC v. Merkin, 791 F.3d 247, 262 (2d Cir. 2015) ("When a defendant has acted with a permissible purpose, such as normal economic self-interest, wrongful means have not been shown, even if the defendant was indifferent to the [plaintiffs'] fate." (internal quotation marks omitted)). The plaintiffs therefore have not shown that Total Gym Repairs engaged in any wrongful conduct that interfered with any prospective business relationships.

---

[9] The plaintiffs also argue that Total Gym Repairs committed an independent tort by illegally performing inspection and maintenance services in violation of the rules of the "EDS Bid No. 17." Pls.' Opp. Br. 37. But the plaintiffs provide no support for this contention. The cited testimony by Mr. Ramotar does not even mention the EDS Bid No. 17. See Daniels Decl. Ex. 9, Ramotar Dep. 59-69 (Docket No. 615-9). Nor does the other cited exhibit, a cease and desist letter sent to Mr. Ramotar, mention the EDS Bid No. 17. See Daniels Decl. Ex. 67 (Docket No. 617-17).

**The Tri-State and Guardian Defendants:** The plaintiffs make the same flawed arguments with respect to the Tri-State Defendants and the Guardian Defendants -- namely that they provided services on Safe Path Systems in violation of Regulation 155.25.[10] As explained above, those arguments are without merit. The plaintiffs therefore have not shown that the Tri-State Defendants or Guardian Defendants engaged in any wrongful conduct that interfered with any prospective business relationships.[11]

**4.**

Lastly, the plaintiffs must demonstrate that the defendants' alleged interference caused injury to the prospective business relationship. Gym Door I, 206 F. Supp. 3d at 907-08. In order to demonstrate injury, the plaintiffs must identify specific contracts that they would have won but for the

---

[10] The plaintiffs also allege that the Tri-State Defendants and the Guardian Defendants illegally used EDS Bid No. 17, but they do not explain in any way how Tri-State's or Guardian's use of the EDS Bid No. 17 was illegal. They do not explain what the bid was for, nor how Tri-State's and Guardian's use of that bid was illegal. The plaintiffs' bald assertions that the use of this bid was "illegal" cannot create a genuine dispute of material fact in the face of assertions by Tri-State and Guardian that they have never made false representations to any school districts about their authority to maintain or repair Safe Path Systems. Mucciolo Aff. ¶ 5 (Docket No. 536-14); Petriello Aff. ¶ 5 (Docket No. 536-15).

[11] It is unnecessary to reach the issue of whether the Young defendants used any wrongful means. The plaintiffs argue that they did and the Young defendants did not respond to this argument in their reply brief.

defendants' alleged interference. See Berwick v. New World Network Int'l, Ltd., No. 06cv2641, 2007 WL 949767, at *14 (S.D.N.Y. Mar. 28, 2007) ("[The] plaintiff[s] also must allege that [they] would have entered into an economic relationship but for the defendant's wrongful conduct." (internal quotation marks omitted)), aff'd sub nom. Servin v. New World Network Int'l, Ltd., 639 F. App'x 43 (2d Cir. 2016).

Much of the plaintiffs' argument that they have been injured rests on the assumption that they would have been awarded all contracts to maintain and service the Safe Path Systems if their competitors had not sought those contracts in alleged violation of Regulation 155.25. The plaintiffs argue that, but for the illegal bids by their competitors to perform maintenance and repair work on Safe Path Systems, the districts would have followed Regulation 155.25 and awarded the job to the plaintiffs or a certified Safe Path dealer. But this argument again relies on the incorrect assumption that the plaintiffs are entitled to all contracts for maintaining the Safe Path Systems. That is incorrect. The schools were not required to use the plaintiffs or a Safe Path authorized vendor -- they were free to choose other vendors.

Therefore, the plaintiffs must present evidence that they would have won the project in the competitive marketplace -- specifically that they would have been the lowest bidder for the

project. See Gym Door Repairs, 2013 WL 4934868, at *5 ("Moreover, under New York law, DOE may only award contracts to the lowest responsible bidder. GML § 103, Educ. Law §§ 2556(10), 2556(10-a).").  The plaintiffs did not present any evidence in the summary judgment record to support such a claim and do not offer any specific contracts for which they were -- or would have been -- the lowest responsible bidder.

With respect to the Young defendants, the plaintiffs claim that the ESBOCES local districts would not have awarded bids to the Young Defendants if they had not included a "fraudulent Kwik-Wall Parts Manual Price Lists" in the ESBOCES Furniture Bid.  Pls.' Br. 43-44.  But -- even accepting this fact as true, which the Court does not because the plaintiffs do not support it with any citation to evidence in the record -- the plaintiffs do not provide any evidence that they would have been awarded those contracts if the contracts were not awarded to the Young Defendants.  The plaintiffs cannot satisfy the "but-for" causation requirement by demonstrating only that the Young Defendants would not have been awarded the contracts -- they must demonstrate that they would have been awarded the contracts in place of the Young Defendants.  See Berwick, 2007 WL 949767, at *14.  There is no evidence that they would have been.  In fact, to the contrary, the plaintiffs did not even bid on the ESBOCES work in 2012, the only year that falls within the

statute of limitations, and therefore plainly could not have received that work, even if the Young Defendants had not placed a bid. ESBOCES Rule 56.1 ¶ 223.

With respect to Thurnau, the plaintiffs claim that he interfered with their prospective business relationships with the Nassau County Cooperative and Middle Country.

As an initial matter, some of the business that the plaintiffs claim Thurnau interfered with from the Nassau County Cooperative was in 2009, 2010, and 2011. See Pls.' Opp. Br. 41-42. Recovery for those alleged injuries is barred by the statute of limitations.

In any event, the plaintiffs have not demonstrated that they would have been awarded those contracts but-for Thurnau's actions. The plaintiffs do not present evidence that they were the lowest bidder for the work and therefore would have received the contracts but-for Thurnau's discussions with those schools.

The plaintiffs also argue that they lost the Middle Country bid because Thurnau advised the district against accepting a sole source letter for the maintenance of the Safe Path Systems. But the plaintiffs did not have the lowest bid for that contract. Fiorino Decl. ¶ 4 (Docket No. 518). And the plaintiffs were not entitled to a sole source contract. They therefore cannot argue that they were entitled to the contract

and that Thurnau's interference was the cause of their losing it.

5.

Accordingly, the plaintiffs have not shown that there was any tortious interference with prospective business relationships. The motion for summary judgment made by the Young Defendants, Thurnau, Total Gym Repairs, the Tri-State Defendants, and the Guardian Defendants to dismiss this tortious interference claim is **granted**.

V. Civil Conspiracy

Thurnau, ESBOCES, and the Young Defendants have moved for summary judgment dismissing the civil conspiracy claim against them.

"It is textbook law that New York does not recognize an independent tort of conspiracy. If an underlying, actionable tort is established, however, [the] plaintiff[s] may plead the existence of a conspiracy in order to demonstrate that each defendant's conduct was part of a common scheme." Sepenuk v. Marshall, No. 98cv1569, 2000 WL 1808977, at *6 (S.D.N.Y. Dec. 8, 2000) (citation omitted). To establish a claim of civil conspiracy, the plaintiffs "must demonstrate the primary tort, plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the

42

furtherance of a plan or purpose; and (4) resulting damage or injury." World Wrestling Fed'n Entm't, Inc. v. Bozell, 142 F. Supp. 2d 514, 532 (S.D.N.Y. 2001). Under New York law, in order to be liable for acting in concert with a primary tortfeasor under a theory of either conspiracy or aiding and abetting, the defendant must know of the wrongful nature of the primary actor's conduct. Pittman by Pittman v. Grayson, 149 F.3d 111, 123 (2d Cir. 1998). "It is essential that each defendant charged with acting in concert have acted tortiously and that one of the defendants committed an act in pursuance of the agreement which constitutes a tort." Rastelli v. Goodyear Tire & Rubber Co., 591 N.E.2d 222, 224 (N.Y. 1992); see also Gym Door I, 206 F. Supp. 3d at 913–14.

### A.

As discussed above, the plaintiffs have not demonstrated that any of the defendants tortiously interfered with the plaintiffs' prospective business relationships, and therefore the plaintiffs have not shown that the defendants committed an underlying, actionable tort. The plaintiffs therefore cannot sustain a claim for civil conspiracy.[12] See Gym Door I, 206 F. Supp. 3d at 913.

---

[12] The Young Defendants have not moved for summary judgment on the plaintiffs' claim for copyright infringement. However, even if the plaintiffs ultimately prove that the Young Defendants committed copyright infringement, they cannot maintain a claim

**B.**

The plaintiffs also have failed to offer evidence
establishing that there was any agreement between Thurnau, the
Young Defendants, ESBOCES, and/or any other third party.

**Thurnau:** With respect to Thurnau, as noted above, there is
no evidence that Thurnau did anything improper or illegal. Nor
is there any evidence that he agreed with others to interfere
unlawfully with the plaintiffs' business. The only
communications cited by the plaintiffs between Thurnau and third
parties that fall within the statute of limitations are: (1) an
email exchange with an employee from Middle Country; and (2) two
email exchanges with an employee of Young Equipment Sales.
Fiorino Decl. Ex. A (Docket No. 518-1); Daniels Decl. Ex. 156
(Docket No. 621-1); Daniels Decl. Ex. 166 (Docket No. 621-11).
None of these email exchanges provide any evidence that there
was an agreement between Thurnau and Middle Country and/or the
Young Defendants to interfere with the plaintiffs' business. As
discussed above, in each of these communications, Thurnau was
simply responding to an inquiry by a third party regarding the
NYSED's interpretation of Regulation 155.25. His truthful
response to these third parties is not evidence that there was

---

for civil conspiracy to commit copyright infringement. Gym Door
I, 206 F. Supp. 3d at 916.

an agreement between Thurnau and others to harm the plaintiffs'
business.

**Young Defendants/ESBOCES**: The plaintiffs also have not
presented evidence of an agreement between the Young Defendants
and ESBOCES to interfere with the plaintiffs' business
relationships.

The plaintiffs argue that there must have been an agreement
between ESBOCES and the Young Defendants, and they both must
have intentionally participated in the conspiracy, because
ESBOCES accepted a fraudulent bid from the Young Defendants.
Pls.' Opp. Br. 59 ("[T]he evidence of an agreement is
indisputable: On three separate occasions, ESBOCES accepted
fraudulent documents for . . . [a bid] and awarded that bid to
Young Equipment Sales."). As the plaintiffs see it, because
ESBOCES awarded work to the Young Defendants pursuant to an
allegedly illegal bid -- which the plaintiffs allege amounts to
either an intentional crime or gross negligence by ESBOCES, see
Pls. Opp. Br. 59 -- there must have been an agreement between
ESBOCES and the Young Defendants to secure the bid for the Young
Defendants despite the illegal bid. But this argument amounts
to nothing more than conjecture. The plaintiffs have not
presented evidence of any discussions between the Young
Defendants and ESBOCES where ESBOCES expresses willingness to
award the bid to the Young Defendants despite the illegality of

the bid.  The plaintiffs have also presented no evidence that ESBOCES was aware of any problems with the bid documents when the documents were submitted, which the plaintiffs tacitly admitted by asserting that accepting the bid documents was at least gross negligence.  While the Court is required on summary judgment to draw all reasonable inferences in favor of the non-moving party, the Court is not required to make inferential leaps that are unsupported by any evidence in the record.

It is undisputed that ESBOCES took every effort to explain to its member schools that the Young Defendants could not perform work outside the bid that they had submitted, and also remedied the issue by pulling the allegedly false portion from the Young Defendants' bid.  ESBOCES Rule 56.1 ¶¶ 227-29, 231-33, 236, 243-46, 249-50, 283.  This action directly contradicts the plaintiffs' claim that there was an agreement between ESBOCES and the Young Defendants to secure the Young Defendants work under the allegedly illegal bid.

Finally, as discussed above, the plaintiffs have failed to demonstrate that they suffered any identifiable damage or injury as a result of the alleged conspiracy.  They have not identified any contract that they would have won but for the defendants' alleged conspiracy.  In the absence of any alleged damages, the plaintiffs cannot sustain a claim for civil conspiracy.

## VI. Copyright Infringement

ESBOCES, Bellmore, the Tri-State Defendants, and the Guardian Defendants have moved for summary judgment dismissing GDRI's claims of copyright infringement against them.[13]

To succeed on an infringement claim, the plaintiffs must demonstrate that "(1) the defendant has actually copied the plaintiff[s'] work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectable elements of plaintiff[s']." Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57, 63 (2d Cir. 2010) (internal quotation marks and citations omitted). In the absence of proof of actual copying, the plaintiffs may establish copying by demonstrating access to the copyrighted work and that "there are similarities between the two works that are probative of copying." Porto v. Guirgis, 659 F. Supp. 2d 597, 608 (S.D.N.Y. 2009) (internal citation omitted); see also Wolstenholme v. Hirst, 271 F. Supp. 3d 625, 636 (S.D.N.Y. 2017).

### A. ESBOCES

GDRI contends that ESBOCES copied GDRI's training materials, but GDRI has proven neither that ESBOCES accessed its

---

[13] GDRI also alleges a claim for copyright infringement against the Young Defendants, but the Young Defendants did not move for summary judgment dismissing that claim.

alleged copyrighted material nor that there is a substantial similarity between ESBOCES' training materials and its own.

GDRI provided ESBOCES with Safe Path training DVDs in 2005 in sealed cases. ESBOCES asserts that it has not opened those DVDs. ESBOCES Rule 56.1 ¶¶ 263-64. Indeed, counsel for ESBOCES offered up the sealed cases at argument of the current motions. The plaintiffs have not provided any evidence to rebut this assertion. While the plaintiffs dispute this fact, they do so without providing any citation to evidence in the record and they therefore fail to create a genuine dispute as to this fact. Pls.' Response to ESBOCES Rule 56.1 ¶¶ 263-64.

Moreover, the plaintiffs do not make any arguments -- and have offered no evidence to support -- that there is substantial similarity between ESBOCES' training materials and the plaintiffs' training materials. Instead, the plaintiffs argue that ESBOCES must have used the Safe Path training materials because the ESBOCES materials (which ESBOCES allegedly used as its own training materials) expressly "require the insertion and use of device specific training information." Pls. Opp. Br. 45. They also note that the ESBOCES training materials reference an audiovisual aid and argue that this audiovisual aid must have been the Safe Path video. But these arguments are nothing more than speculation. The plaintiffs provide no evidence that the training materials used by ESBOCES actually included device

48

specific training information from SPS or that ESBOCES used any audiovisual aid, let alone the Safe Path video. The plaintiffs have not even included as evidence copies of ESBOCES' training materials. It is not enough for the plaintiffs to simply state that it is a "logical . . . conclu[sion]" that ESBOCES used their materials -- they must provide some evidence in support of that supposedly logical conclusion.

Moreover, if ESBOCES had used the materials (which there is no evidence they did), GDRI provided ESBOCES with a license to use its training materials. See Davis v. Blige, 505 F.3d 90, 99-100 (2d Cir. 2007).

GDRI provided the training materials to ESBOES with a letter that stated: "We are providing for your review and use the 2005 electrically operated partition 'Safe Path' safety system staff training procedure materials." Kleinberg Decl. Ex. LLL (Docket No. 547-91); see also ESBOCES Rule 56.1 ¶ 259. Stephen Cole testified at his deposition that the letter, which he drafted, does not appear to place any restrictions on the use of the materials. Kleinberg Decl. Ex. B, at 904-05 (Docket No. 547-8). The plaintiffs argue that Stephen Cole actually intended for the materials to be purchased, see Daniels Decl. Ex. 1, at 760-61 (Docket No. 615-1), and that his letter "could have been clearer," Pls.' Opp. Br. 46. But Stephen Cole's subsequent testimony regarding his supposed intention with

respect to the training materials cannot override the clear statement in the letter that accompanied the DVDs when they were sent to ESBOCES. That letter gave ESBOCES a license to use the materials.

## B. Bellmore

GDRI alleges that Bellmore infringed its copyrighted material when Bellmore used several pages from the plaintiffs' training materials in bid invitations in 2011, 2012, and 2013.

As an initial matter, the statute of limitations for copyright infringement is three years. Gym Door I, 206 F. Supp. 3d at 894. Accordingly, the plaintiffs cannot sustain a claim for copyright infringement for Bellmore's use of those materials before June 2, 2012.

In any event, Bellmore is entitled to fair use of the materials. "The four factors identified by Congress as especially relevant in determining whether the use was fair are: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the substantiality of the portion used in relation to the copyrighted work as a whole; (4) the effect on the potential market for or value of the copyrighted work." Harper & Row Publishers v. Nation Enters., 471 U.S. 539, 560-61 (2016).

Here, the training materials were used by a non-profit entity -- a public school district -- as part of a bid

administered on behalf of the Nassau County Cooperative, an association of public school districts in Nassau County. ESBOCES Rule 56.1 ¶ 115. Bellmore was not seeking any business from which they would profit from this bid, but rather was seeking to elicit offers to perform work at the public schools in compliance with the bid specifications. Bellmore used only 1.5 pages of the Safe Path training materials in an approximately 25-page bid. ESBOCES Rule 56.1 ¶¶ 128, 130.[14] The materials were basic, and the plaintiffs have acknowledged that the maintenance requirements for Safe Path Systems are not substantively different from the maintenance for other sensor device products. ESBOCES Rule 56.1 ¶¶ 63, 136. GDRI also has not offered any evidence that Bellmore's use had any effect on the market for the materials.

Accordingly, Bellmore is entitled to fair use of the materials.

### C. The Tri-State and Guardian Defendants

The Tri-State and Guardian Defendants argue that there is no evidence of copyright infringement.

The only documentary evidence offered by the plaintiffs in support of their claim for copyright infringement against the

---

[14] GDRI disputes that only 1.5 pages of the manufacturer's instructions were used, but provides no citation in support of this contention, and therefore fails to create a genuine dispute of fact with respect to this assertion.

Tri-State Defendants is a two-page document which was produced by Tri-State. Furgang Aff. Ex. S (Docket No. 536-20). The document lists the inspection requirements for the Safe Path System and has a blank for a price for that inspection. Id. Nassau BOCES provided this document to Tri-State and asked Tri-State to fill it out as part of a bid to perform work on EOPs at schools affiliated with Nassau BOCES. Furgang Aff. Ex. O (Docket No. 536-16). Tri-State filled out the form provided by Nassau BOCES, made a copy for its records, and returned the form to Nassau BOCES. Id. The plaintiffs make the remarkable claim that making the single copy for its records supports a claim of copyright infringement against Tri-State.

It is plainly fair use to make a single copy of a one-page form provided by another party to keep as a business record. And GDRI has not offered any evidence that Tri-State's single use of this one-page document interfered with the market for the manual.

The plaintiffs also argue that the Tri-State Defendants and the Guardian Defendants "must have" had access to Safe Path installation and maintenance protocols because they have performed maintenance services on Safe Path systems and were required by Thurnau to have access to the SPS maintenance protocols to do so. They further argue that Tri-State produced a partial copy of a single attestation where Mucciolo attested

that the maintenance was performed in accordance with the manufacturer's instructions. The plaintiffs argue that this attestation proves that the Tri-State Defendants must have had access to and used their manufacturer's instructions. But there is no actual evidence of access -- the plaintiffs' arguments amount to mere conjecture based on circumstances that they deem suspicious.

Moreover, mere access by the Tri-State and Guardian Defendants is insufficient to demonstrate that those parties infringed the plaintiffs' copyrighted materials. The plaintiffs also need to show that the Tri-State and Guardian Defendants infringed the materials in some way. They have not done so.

### VII. Trademark Infringement and Unfair Competition

The Tri-State Defendants, the Guardian Defendants, and Total Gym Repairs have moved for summary judgment on the claims against them for trademark infringement and unfair competition.

"[T]he elements of a trademark infringement claim under the Lanham Act are: (1) that the plaintiff[s] hold[] a valid mark entitled to protection; (2) that the defendant used the mark; (3) in commerce; (4) in connection with the sale or advertising of goods or services; (5) without plaintiff[s'] consent; and (6) that the defendant's use of a similar mark is likely to cause confusion." Gelicity UK Ltd. v. Jell-E-Bath, Inc., No. 10cv5677, 2013 WL 3315398, at *3 (E.D.N.Y. July 1, 2013) (citing 1-800

Contacts, Inc. v. WhenU.Com, Inc., 414 F.3d 400, 406–07 (2d Cir. 2005)). "Demonstrating use in commerce is a threshold burden because no activity is actionable under the Lanham Act absent the use of a trademark." Id. (alterations, citations, and internal quotation marks omitted); see also Gym Door I, 206 F. Supp. 3d at 900.

"The essence of the tort of unfair competition under New York common law is the bad-faith misappropriation, for the commercial advantage of one person, 'a benefit or property right belonging to another [person].'" Lorillard Tobacco Co. v. Jamelis Grocery, Inc., 378 F. Supp. 2d 448, 456 (S.D.N.Y. 2005) (internal quotation marks omitted) (quoting Volmar Distribs. v. N.Y. Post Co., 899 F. Supp. 1187, 1197 (S.D.N.Y. 1995) (alteration in original)). "It is well-established that the elements necessary to prevail on causes of action for trademark infringement and unfair competition under New York common law 'mirror the Lanham Act claims.'" Id. (quoting Malletier v. Dooney & Bourke, Inc., 340 F. Supp. 2d 415, 436–37 (S.D.N.Y. 2004)). "However, unlike its federal counterpart, a viable common law claim for unfair competition requires an additional showing of bad faith." Id. Therefore, to prevail on a claim for unfair competition under New York common law, the plaintiffs must combine their "evidence supporting liability under the Lanham Act with additional evidence demonstrating that

defendants acted in bad faith." Id. But, under New York law, the use of a counterfeit mark establishes a presumption of bad faith. Id.; see also Gym Door I, 206 F. Supp. 3d at 901.

## A. The Tri-State and Guardian Defendants

The plaintiffs argue that the Tri-State and Guardian Defendants have infringed their trademark and unfairly competed with them by affixing Tri-State and Guardian stickers over Safe Path trademarks on the Safe Path Systems when these defendants maintained and serviced those systems. They argue that this amounts to "reverse passing off" and creates confusion in the marketplace as to the source of the Safe Path Systems. But affixing a sticker on the Safe Path System does not create confusion with respect to the origin of the Safe Path System -- the stickers are meant to promote Tri-State's and Guardian's maintenance and repair services. As the plaintiffs themselves wrote, the sticker is affixed on the Safe Path System by the Tri-State and Guardian Defendants "in order to promote their maintenance and repair services." Pls.' Opp. Br. 51. The plaintiffs have not provided evidence to support their assertion that the affixing of the stickers causes confusion about the origin of the Safe Path System, as opposed to merely providing advertising of Tri-State and Guardian maintenance business.

Indeed, school districts that hired Tri-State or Guardian to service or maintain a Safe Path System would know who they

hired and similarly would know that the companies had not installed the Safe Path System initially. The plaintiffs have presented no evidence to the contrary.

In any event, the plaintiffs cannot sustain a claim for trademark infringement because Safe Path has engaged in naked licensing of its trademark to GDRI. "[I]t [is] unlawful for . . . a trademark owner to grant . . . a license to a licensee for the use of a mark without the retention of supervisory control." Can't Stop Prods., Inc. v. Sixuvus, Ltd., 295 F. Supp. 3d 381, 392 (S.D.N.Y. 2018). Such a license is called a "naked license." Id. "The critical question in determining whether a licensing program is controlled sufficiently by the licensor to protect his mark is whether the licensees' operations are policed adequately to guarantee the quality of the products sold under the mark." Id. at 393.

SPS owns the critical trademark registrations for "Safe Path."[15] SPS does not conduct business (S. Cole Dep. 64 (Docket No. 536-5)); has no payroll (id. at 63-64); has no employees (id. at 65); does no marketing to potential customers or

_____

[15] Tri-State and Guardian contend that SPS owns all the trademarks asserted in the case. The plaintiffs respond that SPS "owns three of the trademark registrations at issue in this case." (Docket No. 577 at 7). But the plaintiffs do not explain how that is responsive to the argument of naked licensing by SPS and, in their brief in opposition, the plaintiffs do not rely on the lack of ownership of the registrations by SPS but contend that there is sufficient control over the use of the marks.

potential dealers (id. at 76); and does not manufacture Safe

Path Systems (id. at 81). Notably, SPS does not have any

contract with GDRI setting forth the scope of their relationship

and thus plainly does not have any contract with GDRI regarding

GDRI's use of the SPS mark. Id. at 64-65, 77. SPS does not

control GDRI's use of the SPS marks. S. Cole Dep. 1295-96

(Docket No. 536-13). There is also no evidence that SPS

monitors GDRI to guarantee the quality of the products sold by

GDRI that bear the SPS trademark. This is a naked license.

The plaintiffs argue that they control the use of the SPS

marks by limiting the use of the marks to authorized dealers and

sending cease and desist letters to entities that use the mark

without authorization (or do as they have done here, and sue

those entities for infringement). Pls.' Opp. Br. 52. But this

says nothing about SPS's naked licensing to GDRI. If SPS keeps

others from using the mark, there still may be a naked license

to GDRI. The plaintiffs do not offer any evidence regarding

whether SPS monitors the quality of products made by GDRI that

bear the SPS trademark, which is the "critical question" in

determining whether there is a naked license. Can't Stop

Prods., Inc., 295 F. Supp. 3d at 393. And it would not be

possible for SPS to monitor GDRI because SPS has no employees.

## B. Total Gym Repairs

The plaintiffs argue that Total Gym Repairs infringed on their trademark or unfairly competed by: using a confusingly similar logo to GDRI's; affixing Total Gym Repairs stickers on the Safe Path Systems in an attempt to confuse customers regarding the origin of the systems; representing to schools that it was authorized to install and repair Safe Path Systems; and breaching a non-compete agreement between the plaintiffs and an employee of Total Gym Repairs.

First, there is no evidence that Total Gym Repairs ever used Safe Path's logo or another logo that looked similar to Safe Path's logo. Total Gym Repairs Rule 56.1 ¶ 194. In fact, Mr. Cole testified that he did not believe Total Gym Repairs created a logo that was similar to Safe Path's logo. S. Cole Dep. 1134 (Docket No. 552-6). In their response to Total Gym Repairs' Rule 56.1 Statement, which asserts that Total Gym Repairs "has not created a logo that is similar to the Safe Path logo," the plaintiffs assert that they "do contend that Total Gym's logo is confusingly similar to GDRI's." Pls.' Response to Total 56.1 ¶ 194 (Docket No. 576). But that assertion is entirely unsupported -- the plaintiffs provide no citation. Moreover, testimony in the record actually directly contradicts this assertion. S. Cole Dep. 1134 (Docket No. 552-6). Therefore, the plaintiffs have not presented any evidence that

the Total Gym Repairs logo is confusingly similar to the Safe Path logo.

With respect to the stickers, there is no evidence that Total Gym Repairs or Mr. Ramotar placed any stickers with the Total Gym Repairs logo on the Safe Path Systems, or that those stickers were placed over Safe Path Systems' own logo on the equipment. Mr. Ramotar testified at his deposition that, while he was working at GDRI, he regularly placed stickers baring the GDRI logo on the equipment when he was servicing it. Ramotar Dep. 67-68 (Docket No. 615-9). But he did not provide any testimony regarding whether he continued this practice when he was working at Total Gym Repairs or if he ever put a Total Gym Repairs sticker on a Safe Path System. None of the photos cited by the plaintiffs in their opposition papers show Total Gym Repairs stickers on the Safe Path Systems. See Pls.' Opp. Br. 54; Daniels Decl. Ex. 42 (Docket No. 616-22), 97 (Docket No. 618-17), 98 (Docket No. 618-18). Additionally, as discussed above, the plaintiffs have not offered any evidence to support their contention that the placement of the stickers has caused, or is likely to cause, any confusion as to the origin of the Safe Path Systems.

The plaintiffs also argue that Total Gym Repairs unfairly competed by submitting bids to perform maintenance and service work on Safe Path Systems in violation of Regulation § 155.25.

But that argument is plainly untenable. Total Gym Repairs was free to submit bids to perform work on Safe Path Systems. The plaintiffs have provided no evidence that any bids that were submitted by Total Gym Repairs were done by using SPS trademarks, or that Total Gym Repairs ever held itself out to potential customers as Safe Path certified or authorized.

Lastly, the plaintiffs argue that an employee of Total Gym Repairs, Mr. Ramotar, unfairly competed with them by soliciting clients in violation of a two-year non-compete agreement that he signed when he left the employ of GDRI. As discussed above, Magistrate Judge Peck limited the scope of the non-compete agreement in this lawsuit to cover only the use of Safe Path Systems at Columbia University, New York University, and the Museum of Modern Art. See Soter Decl. Ex. A, at 3 (Docket No. 650-1) (at a conference regarding discovery disputes, Magistrate Judge Peck noted, "As to the issue of the noncompete and Columbia/MOMA/NYU, the complaint clearly links it to the Safepath Systems"). None of those entities had a Safe Path System at the time relevant to this lawsuit.[16] Sotter Decl. Ex. F, at 1048-50 (Docket No. 552-6). Accordingly, any evidence regarding Mr. Ramotar's interactions with Columbia, New York University, or the Museum of Modern Art is irrelevant to this

---

[16] See supra note 8.

lawsuit because it could not have concerned the maintenance of a Safe Path System, and therefore does not support the plaintiffs' claims for unfair competition in this case.

## VIII.

Bellmore and ESBOCES have moved for sanctions against the plaintiffs pursuant to Rule 11 of the Federal Rules of Civil Procedure. ESBOCES argues that the plaintiffs' claim for copyright infringement is objectively unreasonable, because ESBOCES repeatedly disclosed to the plaintiffs throughout this litigation that they had not accessed the plaintiffs' training materials.

The Court will not issue the sanctions requested. As an initial matter, a motion for sanctions must be made "separately from any other motion" and cannot be made as part of a motion for summary judgment. Fed. R. Civ. P. 11(c)(2). ESBOCES has failed to comply with this requirement and its motion for sanctions is therefore denied. Karla Otto, Inc. v. Rivoli Creation, S.A.S., No. 13cv0483, 2014 WL 6910546, at *1 (S.D.N.Y. Dec. 5, 2014).

The Court also declines to exercise its power to impose Rule 11 sanctions. The standard for issuing such sanctions is high, and ESBOCES has not sufficiently demonstrated that the plaintiffs' copyright infringement claim is so objectively unreasonable to justify sanctions. See, e.g., Bowman Imp./Exp.,

*Ltd. v. F.J. Elsner & Co. N. Am.*, No. 02cv3436, 2003 WL
21543522, at *1 (S.D.N.Y. July 9, 2003) ("For an argument to
warrant Rule 11 sanctions, 'it must be clear under existing
precedents that there is no chance of success.'" (quoting *Shafi
v. British Airways, PLC*, 83 F.3d 566, 570 (2d Cir. 1996)).

## IX.

After filing their opposition to the motions for summary
judgment, the plaintiffs made a motion by letter requesting that
they be allowed to rely on nine audio recordings in those
papers.[17]  Docket No. 591.  The defendants argued that these
recordings cannot be considered by the Court on the motions for
summary judgment because they were previously precluded by
Magistrate Judge Peck.

The plaintiffs have admitted that the recordings they seek
to use in their summary judgment opposition papers were
precluded by Magistrate Judge Peck.  Docket No. 603.  The
recordings were precluded by Magistrate Judge Peck on August 10,
2017.  Soter Reply Decl. Ex. B, at 11 (Docket No. 650-2). The
plaintiffs have not provided any justification for their failure
to file a timely objection to Magistrate Judge Peck's preclusion
of these materials. They have also failed to demonstrate why

[17] As an initial matter, the proper time for the plaintiffs to
make a request to use precluded evidence in their motion papers
would have been before those motion papers -- which referenced
the evidence -- were filed.

these recordings should be considered to avoid an injustice. The recordings were surreptitiously made and contain hearsay and double hearsay. Because these recordings were precluded, the defendants did not seek other discovery related to these recordings, and they would therefore be prejudiced by their use on these motions for summary judgment.

The plaintiffs argue that they should be permitted to rely on the recordings because the defendants opened the door to the use of these recordings in their opening papers -- but that is incorrect. None of the recordings were attached as exhibits to the motion of any defendant. And the only reference to these recordings is a single reference to one video recording in a declaration filed on behalf of Thurnau. Szuberla Decl. ¶ 15 and Ex. D (Docket No. 514). But Thurnau did not seek to introduce the actual video into evidence, nor did he attach the video as an exhibit. This did not open the door to the plaintiffs' use of all of the videos that had been excluded.

Accordingly, the plaintiffs' motion to admit the nine recordings that were previously precluded by Magistrate Judge Peck is denied.

## X.

The plaintiffs submitted a letter to the Court dated July 25, 2018 after oral argument on the motions. Docket No. 676. The letter purported to respond to the questions of the Court at

oral argument that the plaintiffs had not answered, namely what particular contracts did the plaintiffs show with evidence had been lost through the defendants' alleged interference with the plaintiffs' prospective business relations and what was the evidence that the plaintiffs would have obtained those contracts. Rather than relying on the summary judgment record, the plaintiffs purported to put in new exhibits and raise new arguments. The arguments included documents allegedly created after the close of discovery and included hearsay statements and conclusions of counsel, none of which were supported by an affidavit establishing the admissibility of the alleged evidence.

The letter was plainly improper. It was submitted after the conclusion of briefing and argument and was submitted without permission. See Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc., 170 F.R.D. 361, 369 (S.D.N.Y. 1997).

Moreover, in an order issued March 12, 2018, the Court ordered that no further papers were to be filed in connection with the motions for summary judgment. The plaintiffs ignored that order and filed an application to file a cross-motion which sought, among other things, to strike various portions of Thurnau's motion for summary judgment. In an order dated March 15, 2018, the Court denied that application, which was in clear violation of the March 12 order. Docket No. 639. The Court

reiterated that no further papers were to be filed in connection with the pending motions for summary judgment, and that the Court might allow the plaintiffs to submit further papers after the argument. Id. The Court never gave the plaintiffs such permission, either at or after oral argument. The plaintiffs therefore violated this Court's prior order by filing the supplemental letter. The letter and its attachments are stricken.

Further, there is nothing in the letter that changes the conclusions in this opinion or fills the gaps in the plaintiffs' summary judgment record.

## CONCLUSION

The Court has considered all of the arguments of the parties. To the extent not specifically addressed above, the remaining arguments are either moot or without merit. The defendants' motions for summary judgment are **granted** as explained above. The plaintiffs' claims against Eastern Suffolk BOCES, Bellmore Public Schools, Total Gym Repairs, Inc., Carl Thurnau, Tri-State Folding, Peter Mucciolo, Guardian Gym Equipment, Qapala Enterprises, Inc., and James Petriello are

dismissed.  The claims against the Young Defendants are

dismissed except for the copyright infringement claim.

**SO ORDERED.**

**Dated:**     **New York, New York**
          **September 19, 2018**

                                    JOHN G. KOELTL
                            United States District Judge