UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
GYM DOOR REPAIRS, INC., et al.                 :
                                               :
                            Plaintiffs,        :        Case No. 15-cv-4244 (JGK) (OTW)
                                               :
                                               :
                                               :
              -against-                        :
                                               :
YOUNG EQUIPMENTS SALES, INC., et al,           :
                                               :
                            Defendants.        :
-----------------------------------------------------------X


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR SANCTIONS**


By:    Katherine Daniels, Esq.
       KATHERINE DANIELS LLC
       *Attorneys for Plaintiff Gym Door Repairs, Inc. and
       Safe Path Systems, LLC*
       60 June Road, Suite 202
       North Salem, New York 10560
       Tel: (914) 886-8198
       E-mail: KDaniels@katherinedanielsllc.com


       *Eric Su, Esq.*

       *Of Counsel*

i

## <u>TABLE OF CONTENTS</u>

INTRODUCTION…………………………………………………………………..…………1

FACTUAL BACKGROUND…………………………………………………………………1

ARGUMENT……………………………………………………………………………14

    I.      SANCTIONS ARE APPROPRIATE UNDER RULE 37
           AND RULE 11 OF THE FEDERAL RULES OF CIVIL PROCEDURE
           AND THE COURT'S INHERENT POWER TO SANCTION MISCONDUCT…..14

           A.  Rule 37 Sanctions…………………………………………………………………..14

           B.  Rule 11 Sanctions…………………………………………………………………18

           C.  Amount of Sanctions…………………………………………………………….22

               a.  Rule 37……………………………………………………………...…22

               b.  Rule 11……………………………...………………………………23

CONCLUSION…………………………………………………………………..24

## **TABLE OF AUTHORITIES**

### CASES

Design Strategy, Inc. v. Davis, 469 F.3d 284, 296 (2d Cir. 2006) ..............................................16

Doug's World Clocks.com Pty. Ltd. V. Princess Int'l, Inc., 323 F.R.D. 167, 176 (S.D.N.Y. 2017)..........................................................................................................................................23

In re September 11th Liab. Ins. Coverage Cases, 243 F.R.D. 114, 124 (S.D.N.Y. 2007).. 15,16,19, 22, 24

Qualcomm, Inc. v. Broadcom Corp., 539 F. Supp. 2d 1214, 1242 (S.D. Cal. 2007). .................21

Qualcomm, Inc. v. Broadcomm Corp., 2008 U.S. Dist. LEXIS *911 (S.D. Cal. Jan. 7, 2008), vacated, in part, and remanded on other grounds, Qualcomm v. Broadcomm Corp., 2008 U.S. Dist. LEXIS 16897 (S.D. Cal. March 5, 2008)...............................................................20, 23

Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99 (2d Cir. 2002) .................15, 16

Rodick v. City of Schenectady, 1 F.3d 1341, 1350 (2d Cir. 1993) ............................................19

Storey v. Cello Holdings, LLC, 347 F.3d 370, 387 (2d Cir. 2003) ............................................19

Zubulake v. USB Warburg LLC, 229 F.R.D. 422, 432-34 (S.D.N.Y. 2004)........................15, 22

### STATUTES

N.Y. General Municipal Law § 119-o ......................................................................................5

Ed. Law § 409-f ..........................................................................................................1, 5, 13

### RULES

Fed. R. Civ. P. 11.......................................................................................................1, 22

Fed. R. Civ. P. 11(b) ...................................................................................................18

Fed. R. Civ. P 11(b)(1)................................................................................................18

Fed R. Civ P. 11(b)(4)........................................................................................................19

Fed. R. Civ. P. 11(c)..........................................................................................................19

Fed R. Civ. P. 11(c)(2)........................................................................................................2

Fed. R. Civ. P 26..............................................................................................................16

Fed. R. Civ. P 26(a)..........................................................................................................15

Fed. R. Civ. P. 26(a)(5)......................................................................................................14

Fed. R. Civ. P. 26(b)(1)......................................................................................................15

Fed. R. Civ. P. 26(e)(2)................................................................................................15, 17

Fed. R. Civ. P 37....................................................................................1, 15, 16, 17, 22

Fed. R. Civ. P. 37(b)(2)(A)(i)-(iv)........................................................................................22

Fed. R. Civ. P. 37(c)(1)…………………………………………………………          18, 22, 23

Fed. R. Evid. 401 ............................................................................................................16

## REGULATIONS

8 N.Y.C.R.R.§155.25(d)(2)…………………………………………………………….....2

8 N.Y.C.R.R. §155.25(d)(4)..................................................................................................5

8 N.Y.C.R.R. 155.25 ...................................................................................................1, 13

8 N.Y.C.R.R. § 155.4............................................................................................................2

**INTRODUCTION**

This memorandum of law is respectfully submitted in support of Plaintiffs' motion for sanctions pursuant to Rule 37 and Rule 11 of the Federal Rules of Civil Procedure and the Court's inherent power to sanction misconduct.  The motion seeks to compensate the Plaintiffs for the injustice that was done to them as a result of the Defendants' breach of their discovery obligations by withholding highly relevant documents and submitting false testimony to the Court on summary judgment.  The motion also seeks to deter future misconduct of a similar nature.  The public interest in a fair adjudication in this case is extremely high because it involves not only the integrity of the discovery process, but also the integrity of the competitive bidding process for public school health and safety services and the safety of millions of public school children.

**FACTUAL BACKGROUND**

Following the deaths of two students who were crushed and killed in their school gymnasiums by electric folding partitions in 1991 and 2001, New York State enacted legislation requiring the installation of safety devices on all electric partitions in schools.  N.Y. Ed. Law 409-f.  The Commissioner of Education then issued regulations implementing the legislation.  8 N.Y.C.R.R. § 155.25.  The regulations expressly state that the "[s]afety features shall not be tampered with, overridden or by-passed.  All equipment must be maintained in accordance with the manufacturer's instructions, including the manufacturer's recommended service interval, and records of such maintenance shall be permanently retained at the district or private school."  8 N.Y.C.R.R. § 155.25(d)(4).  The regulations also require staff training in the operation of the partitions and safety devices.  The training must include the penalties for disabling the devices

and for non-compliance with the regulatory requirements, a discussion of the past accidents and the potential and possibility of serious injury or death.  8 N.Y.C.R.R. § 155.25(d)(2).  Schools must certify that they have up-to-date records of both safety system maintenance and staff training each year during their annual fire safety inspections.  They are not supposed to receive a certificate of occupancy from NYSED for the school year until they can do so.  8 N.Y.C.R.R. § 155.4.  Due to the health and safety aspects of the electrically operated partition retrofits, safety devices had to be architecturally specified for a particular location and approved by NYSED prior to installation.  Daniels Decl. Ex. 1.  All of these requirements are well known to Defendant Carl Thurnau because he wrote the regulations when he was Director of Facilities Planning for the New York State Education Department ("NYSED").  Daniels Decl. Ex. 34.

Plaintiffs invented and sell the leading safety device (the SAFE PATH System®) used on electric partitions in New York and across the United States.  The SAFE PATH System uses infra-red sensors to create a barrier along the surface of the partition and in the "pocket area" where the partition folds into or stacks against the wall when open.  The SAFE PATH System is designed to halt the forward and backward motion of the partition if the sensors detect a person or object anywhere near the surface of the partition or pocket area.  The SAFE PATH System was patented until October 17, 2011.  ECF 91, Ex. 1.  The manufacturer's instructions for inspection, maintenance and staff training for the SAFE PATH System are protected by copyrights, which are federally registered.  Id., Ex 5.  Plaintiffs also developed a staff training video and webinar, which can be licensed by schools for a nominal annual fee of $750 per year.  Once licensed, the webinar can be viewed by an unlimited number of users each year and it generates training certificates to help the schools keep track of who has received the state-mandated staff training for SAFE PATH.

Defendant Tri-State Folding Partitions, Inc. and its principal, Peter Mucciolo (hereinafter "Tri-State"), are in the business of repairing folding partitions and other gymnasium equipment. Tri-State was briefly authorized by Plaintiffs to provide SAFE PATH installation, inspection, maintenance and repair services, but its authorization was terminated on March 15, 2011 after it badly botched an installation job at Orange Ulster BOCES.  Daniels Decl. Ex. 2.

Defendant Qpala Enterprises, Inc. and its principal, James Petriello (a former Tri-State employee), conduct business under the name Guardian Gym Equipment (referred to collectively herein as "Guardian").  Guardian sells safety devices for electric partitions known as the "Guardian Protection System."  Guardian is a direct competitor of Plaintiffs and has never been authorized or even trained to work on SAFE PATH.

Both Tri-State and Guardian perform "inspection" and "repair" work on SAFE PATH without authorization or training. [1]   Daniels Decl. Ex. 4 (Mucciolo Dep. 17-20, passim); Daniels Decl. Ex. 5 (Petriello Dep. 18-20, 24, 38, 43-47, 51-60, 92, 98).   To avoid liability for copyright infringement in this case, Petriello and Muccio testified that they do not perform preventative maintenance or provide staff training for the SAFE PATH devices they service, even though preventative maintenance and staff training are expressly required by Commissioner's Regulation § 155.25(d)(2) and (4).[2]  Daniels Decl. Ex. 4 (Mucciolo Dep. 51, 93). Daniels Decl.

---

[1] Technicians for Tri-State and Guardian have received no training since the early 2000s and, even then, it was limited to the Guardian Protection System and did not include SAFE PATH. Daniels Dep. Ex. 4 (Mucciolo Dep. 18-20, 92).

[2] Petriello testified that he has never even seen the maintenance instructions for SAFE  PATH, Petriello Dep. 27-28, 56-57, 92.  SAFE PATH preventative maintenance procedures, which are

3

Ex. 5 (Petriello Dep. 19, 34).  It is doubtful that school districts understand that SAFE PATH

preventative maintenance has not been done.  In some cases, Tri-State and Guardian expressly

represent to their customers that they have conducted preventative maintenance on SAFE PATH.

See, e.g., Daniels Decl. Exs. 28, 29.

Because Guardian and Tri-State don't have access to SAFE PATH parts, when a sensor,

control box or other component of the safety device fails, they remove it and replace with

sensors, pressure sensitive mats and control boxes for Guardian Protection Systems, which are

neither consistent with the product specifications for SAFE PATH nor approved by NYSED for

use in SAFE PATH locations.  Daniels Decl. Ex. 5 (Petriello Dep. 36-37).  According to Mario

Ramotar of Total Gym, this practice is widespread:  *"All these districts, you know, a lot of the*

*Safe Paths have been taken out and [are] being replaced with other system[s].  You know,*

*there's – there are some that looks like Safe Path, but it's not Safe Path.  You know, you can go*

*and look at it, oh, that's Safe Path.  Oh, there's an instance, I can't remember which school, it*

---

protected by copyright, go far beyond a simple "inspection" or "test" of the device to make sure

it is working.  For example, preventative maintenance involves removing the existing security

seal on the control panel, accessing and checking the wiring and voltage, performing an AMP

test on the power output terminals, checking the power draw, testing the anti-masking function of

all PIR sensors that incorporate that feature and providing a new security seal and security

number of the control panel.  Daniels Decl. Ex. 6.  The security seal helps ensure that the control

panel has not been tampered with between maintenance visits.  SAFE PATH preventative

maintenance also involves checking the state-mandated signage and making sure that the school

has access to and is using the staff training materials.  Id.

*even said Safe Path on the panel.  I opened the panel, it's a complete – the inside is completely*

*different."*  Daniels Decl. Ex. 7 (Ramotar Dep. at 62-63 (emphasis added)).  It is unlikely that

school district officials are made aware that their SAFE PATH Systems are being jerry-rigged in

this fashion.  Tampering with safety devices is expressly prohibited by Ed. Law § 409-f; 8

N.Y.C.R.R. §155.25(d)(4) ("[s]afety features shall not be tampered with, overridden or by-

passed").  Even Mario Ramotar of Defendant Total Gym (and a former employee of Plaintiffs)

testified that he finds this practice to be unacceptable.  Id. at 134.

Although Guardian denied it and withheld evidence so it could win summary judgment,

Tri-State and Guardian frequently "inspect" and "repair" SAFE PATH safety devices under a

cooperative bid administered by Clarkstown Central School District[3] and Educational Data

Services (herein after "EDS Bid #17), which covers maintenance and repair work on electric

partitions but does not include safety devices.[4]  Daniels Decl. Ex. 15-17.  As explained in more

---

[3] In 2003, Stephen Cole observed that Tri-State and Guardian had installed non-compliant

Guardian Protection Systems in Clarkstown Central School District.  Cole reported this to Carl

Thurnau at NYSED and recommended that NYSED compliance specialists investigate.  Daniels

Decl. Ex. 3.  To Cole's knowledge, the matter was never corrected.  However, in the course of

discovery in this case, it became clear that Thurnau personally approved the devices for

installation in Clarkstown.  See, e.g., Daniels Decl. Ex. 38.  It is probably no mistake that

Clarkstown now administers EDS Bid #17.

[4] Under § 119-o of the N.Y. General Municipal Law, school districts and BOCES have the

power to enter into agreements to purchase goods and services collectively through "cooperative

bids."

detail below, EDS Bid #17 is one of several cooperative bids used by the Defendants and the school officials conspiring with them to keep Plaintiffs out of the schools by cutting them out of the competitive bidding process for SAFE PATH maintenance and repair work.

On June 1, 2015, Plaintiffs brought this action against the Defendants alleging patent infringement, copyright infringement and tortious interference with Plaintiffs' business relationships with the schools in which SAFE PATH Systems were installed.  ECF 1.  The Plaintiffs amended their complaint on July 27, 2016 to add a count for civil conspiracy.  ECF 91. A key allegation in Plaintiffs' amended complaint was that the Defendants were conspiring to use cooperative bids, including EDS Bid #17, to engage in unfair competition and interfere with Plaintiffs' ability to compete fairly in the market to maintain and repair its SAFE PATH Systems.  ECF 91 ¶¶ 57, 59, 61, 80, 81, 99-106, 118, 130, 175, 198, 199.  The Defendants were also promoting the "Latest New trend for Gym Partition Safety Devices – It's called take them 'Down and Out Safety Systems'!" and conspiring with districts to remove the partitions with SAFE PATH devices and replace them with walk-draw curtains using cooperative bids that cover installation of curtains but not removal of the partitions or safety devices.  Daniels Decl. Ex. 26.  This too was intended to keep Plaintiffs out of the schools where they could observe the non-compliance.

On July 27, 2016, Plaintiff filed a motion for a temporary restraining order seeking to preliminarily enjoin the Defendants from misusing EDS Bid #17 during the pendency of the case.  ECF 178, 180-185.  EDS Bid #17 covers "maintenance and repair work in various trades on a time and materials basis."  It includes the maintenance and repair of electric partitions, but, as the bid specifications dated January 14, 2016 clearly state, ***"[t]his bid package for Folding Door and Replacement does not include the installation or repair/maintenance of electronic***

*monitoring devices (electric eye) and the installation or repair/maintenance of these devices are to be considered as outside the scope of this bid.  Service or installation for such devices are the responsibility of the district and not covered in this bid."*  Daniels Decl. Ex. 8 pg. 4. This fact was reinforced in a Declaration dated August 2, 2016 submitted in this action by Alan Wohl, the President of EDS, in connection with EDS's dismissal from this case.  Daniels Decl. Ex. 9 ¶ 5 *("Ed-Data EDS bid packages for Maintenance and Repair Work in Various Trades on a Time and Material basis (T and M bids) does not include installation, inspection maintenance, repair, or staff training for SAFE PATH® or other electronic motion sensor devices")*.  As part of the settlement agreement, EDS also sent letters to participating districts in *July 2016* reminding them of this.  Daniels Decl. Ex. 10.

Although there was never any genuine dispute as to whether EDS Bid 17 covers safety devices, the Defendants and their counsel led the Court to believe that there was.[5]  For years, the Defendants and the school facilities personnel conspiring with them (including Defendant Carl Thurnau, former Director of Facilities Planning for the NYSED and currently Director of Facilities for New Rochelle City School District) have purposefully caused their school districts to believe that SAFE PATH inspection, maintenance and repair can lawfully be done under EDS Bid #17 when that has *never* been the case. This manufactured confusion has enabled non-compliant schools to avoid having to obtain legitimate bids or quotes for SAFE PATH inspection, maintenance and repair.  They simply lump these services in with maintenance and

---

[5] On August 1, 2016 and September 9, 2016, the Court denied Plaintiffs motion for a temporary restraining order and preliminary injunction citing the alleged confusion as to the scope of the bid.  ECF 213.

repairs of the partitions.  It's a dirty trick and, unfortunately, an extremely effective one.  The majority of school districts in New York participate in EDS Bid #17.  Daniels Decl. Ex. 11.  Tri-State, Guardian, Total Gym and Young Equipment Sales have monopolized EDS Bid #17 since at least 2011.  Daniels Decl. Ex. 12.  Plaintiffs have lost most of their SAFE PATH and partition repair business as a result of the fraudulent activity surrounding EDS Bid #17 and other cooperative bids that are being misused in a similar fashion to keep Plaintiffs out of the schools.

After the close of discovery, the Defendants moved for summary judgment.  The lynchpin of their argument was the claim that Plaintiffs had no evidence of the alleged conspiracy to use bids like EDS Bid #17 to harm their business.  Plaintiffs had complained to the Court several times during discovery that the Defendants were withholding purchase orders, invoices and other communications responsive to their document demands.[6]  Plaintiffs were reasonably certain that relevant purchase orders and invoices were missing because when they call their SAFE PATH customers to schedule annual preventative maintenance, they are often told that one of the Defendants has already done it.  Guardian produced a few invoices for SAFE PATH inspection and repair, but withheld the corresponding purchase orders and correspondence

---

[6] Plaintiffs' First Set of Document Requests demanding, among other things, that Guardian and Tri-State produce "[a]ll communications with and documents that refer or relate to Carl T. Thurnau";  "[a]ll documents related to and communications with or concerning Educational Data Systems, Inc. . .  or EDS Bid No. 17"; and all price quotes, purchase orders, invoices and certified payroll records for the "installation, inspection, maintenance, repair of and staff training for folding partitions and/or safety systems" Daniels Decl. Ex. 13 (Plaintiffs' First Set of Document Requests, Nos. 5, 16, 29-31).

showing that EDS Bid #17 was used.  Magistrate Judge Peck, who was managing discovery, admonished the Defendants for failing to cooperate with Plaintiffs in discovery and failing to search their clients records and produce documents in a timely fashion.  See, e.g., ECF 779 Ex. P (Aug. 3, 3017 Tr. 27, 34-38), ECF 779 Ex. S (Sept. 19, 2017 Tr. 49); Daniels Decl. Ex. 14 (July 28, 2017 Tr. 18-22)).  ***On September 19, 2017, counsel for Tri-State and Guardian represented to Judge Peck that all responsive documents had been produced and where they had not been produced they did not exist.***  ECF 779, Ex. S at 49.

In response to questions posed by counsel for Thurnau and ESBOCES, Petriello specifically denied in his deposition that Guardian has ever performed SAFE PATH work under EDS Bid #17 and testified that he was unaware that Defendant Carl Thurnau had any knowledge regarding the misuse of EDS Bid #17.  Daniels Decl. Ex. 5 (Petriello Dep. 111-12, 126-28, 133).  On **September 19, 2018**, the Court granted the Defendants' motions for summary judgment, but has not yet entered judgment in the case.  ECF 685.

On or about **April 29, 2019**, Plaintiffs received copies of purchase orders, invoices and correspondence obtained from New Rochelle City School District in response to a Freedom of Information Law ("FOIL") request sent to the district ten months earlier on **June 1, 2018**.[7]

---

[7] FOIL requests sent to other districts at around the same time reveal that Tri-State also withheld invoices and purchase orders evidencing its use of EDS Bid. #17 to replace SAFE PATH control panels and sensors in Lindenhurst and to "perform preventative maintenance" on SAFE PATH in Oppenheim Ephratah St. Johnsville ("OESJ").  Daniels Decl. Exs. 28 and 29.  In OESJ, Tri-State contracted with the district specifically to "performing preventative maintenance" on the districts safety systems (both SAFE PATH).  Mucciolo testified in his deposition, under oath, that Tri-

Daniels Decl. Ex. 31.  These documents, **which were never produced in discovery**, show that

New Rochelle and Guardian used EDS Bid #17 to perform SAFE PATH "inspection" and

"repair" services on New Rochelle's twelve SAFE PATH Systems in 2016, 2017 and 2018.

Daniels Decl. Ex. 20, 21, 22, 23.  The documents demonstrate that Defendant Carl Thurnau --

who Petriello testified hired Guardian to inspect and repair the safety devices, Daniels Decl. Ex 5

(Petriello Dep 75) -- **was not only aware of that EDS Bid #17 was used by the district to do this**

**work but personally signed off on it**.  Daniels Decl. Ex. 20 pgs. 5-7, 9, Ex. 20.

        As parties to this litigation, both Thurnau and Petriello knew that EDS Bid #17 does not

cover anything to do with safety devices.  They also knew that New Rochelle had received the

letter from EDS in **July of 2016** reminding the district of this fact. Daniels Decl. Ex. 10

("***Specifically, Bid Package #17 Folding Door Repair and Replacement does not and has never***

***included the installation, inspection, maintenance, repair or staff training for SAFE PATH®***

***or any other electronic motion sensor devices***.") (emphasis added).  The withheld documents

show that on October 10, 2017, Petriello even acknowledged to district officials that EDS Bid

#17 does not cover "safety device inspections."  Daniels Decl. Ex. 21 pg. 4-6.  However, he did

so to defend the higher price he was charging the district for the inspections, not to end the

practice of misusing the bid.  This information was passed on to Carl Thurnau, <u>id</u>. pg. 5, by a

district employee but it did not stop Thurnau from approving Guardian's invoices.  Nor did it

stop New Rochelle and Guardian from using ESD Bid #17 again a few months later and the

---

State does not perform preventative maintenance at all.  Daniels Decl. Ex. 4 (Mucciolo Dep. 51,

93).  Since both representations cannot be true, Mucciolo either submitted false testimony to the

Court or lied to the school district.

following year for SAFE PATH "repairs."  Daniels Decl. Exs. 22, 23.  Petriello and Thurnau both know that safety device repairs are not covered by EDS Bid #17 either.  These documents were obviously responsive to Plaintiffs' demands and clearly relevant because they support Plaintiffs claim that the Defendants are conspiring to use cooperative bids to circumvent to normal bidding process for SAFE PATH preventative maintenance and repair.[8]

New Rochelle could not provide any records showing that preventative maintenance or staff training have ever been done for its SAFE PATH Systems.  Daniels Decl. Ex. 19 pg. 6.  This is not surprising since Petriello testified that Guardian does not do preventative maintenance or staff training for SAFE PATH.   Daniels Decl. Ex. 5 (Petriello Dep. 19, 34).  However, without records of annual preventative maintenance and staff training, which the district is required by law to permanently maintain under 8 N.Y.C.R.R. 155.25(d)(2) and (4), New Rochelle should not have been able to pass its annual fire safety inspections and should not have received its certificates of occupancy from NYSED in any of the delinquent years.[9]  Carl Thurnau knows this from his time at NYSED.  See, Daniels Decl. Ex. 32 (email exchange between Carl Thurnau and John Shea, Chief Executive Officer for Facilities for the New York City Department of Education:  ***"The regulations require maintenance, which would be***

---

[8] Also, withheld from the production was email correspondence from James Petriello to Lori Swink of New Rochelle asking her to forward a picture of a by-passed key switch to Carl Thurnau.  Daniels Decl. Ex. 24.  This too was responsive to Plaintiffs' demands.  Daniels Decl. Ex. 13, No. 5.

[9] According to press reports, New Rochelle opened without a valid certificate of occupancy in the fall of 2016 due to numerous safety violations.  Daniels Decl. Ex. 27.

*considered more than a pass/fail safety test"*).  In fact, Turnau wrote the regulations requiring it.

Daniels Decl. Ex. 34.  Thurnau's solution to New Rochelle's predicament:  In 2018, New

Rochelle hired Young Equipment Solutions (also known as Young Equipment Sales) to rip out at

least nine of the district's folding partitions and SAFE PATH devices and replace them with

Spaulding walk-draw curtains, which do not require safety devices.  This was done at great

expense to the district using an EDS bid that covers installation of the curtains but not removal of

the partitions.  Daniels Decl. Ex. 25.  Thurnau initially told New Rochelle's FOIL records officer

that Young did the partition removals on a BOCES cooperative bid.  After Plaintiffs pointed out

that there is no such bid, his story switched to another cooperative bid administered by EDS,

which also does not cover partition removals.  Id. pg. 1. Partition removal is a "trend" being

promoted by the Defendants to school districts across the state.  It too is part of the coordinated

effort by the Defendants and non-compliant school districts to get rid of SAFE PATH Systems

so that non-compliance can remain hidden from the Plaintiffs and the public.  Daniels Decl. Ex.

26 ("Check out the Latest New trend for Gym Partition Safety Devices – It's called take them

"Down and Out Safety Systems"!).

Removing the partitions in New Rochelle was costly and has not been popular with users

of the gymnasiums who find the walk-draw curtains to be inadequate. Daniels Decl. Ex. 28.  The

same thing is happening in districts across the state.  Absent the conspiracy to keep them out,

Plaintiffs could have restored New Rochelle's jerry-rigged SAFE PATH devices to their original

NYSED-approved condition.  Plaintiffs also could have provided the requisite documentation for

preventative maintenance and staff training for a small fraction of the cost of removing the

partitions.  Preventative maintenance costs between $299 and $600 annually, depending on the

location and site conditions.  Daniels Decl. Ex. 31 (Decl. Kathleen Cole).  Repairs, when

required, tend to average around $2,000.  Id.  State-mandated staff training could have been provided district wide via Plaintiffs' webinar (the content of which was approved for use by Carl Thurnau when he was at NYSED) for a modest annual fee of $750.  Id.

Of course, if Plaintiffs had been allowed into New Rochelle to maintain and repair the safety devices, they would have observed that New Rochelle was in violation of the regulations and continued to be in violation of the regulations under Thurnau's watch.  They also would have seen that Guardian had been jerry-rigging the district's SAFE PATH devices with pressure sensitive mats and other Guardian parts that are not compatible with SAFE PATH's product specifications and have never been approved by NYSED for use in those locations.   Petriello and Thurnau could not let that happen.

Carl Thurnau knows that New Rochelle is not alone and that there is systemic non-compliance with Ed. Law 409-f and 8 N.Y.C.R.R. 155.25  throughout New York State.  He also knows that Guardian has been installing non-compliant safety systems since at least 2003. Daniels Decl. Ex. 3.  In 2009, Thurnau caused the Commissioner of Education to assure the legislature that NYSED was monitoring the situation and that New York City was in "full compliance" with the law when that simply was not true.  Daniels Decl. Ex. 35.  Maintaining this fiction is why it is so important to Thurnau, who is now Co-Chair of the New York State School Facilities Management Institute, a state-wide organization for training school facilities professionals, and the other politically powerful facilities professionals in New York State, including Fred Koelbel (Plant Facilities Administrator and Director of Transportation for Port Jefferson School District and State Director of the New York State School Facilities Association), John Shea (Chief Executive Officer for Facilities, NYCDOE) and Keith Anderson

(Director of Facilities for Eastern Suffolk BOCES), to keep Plaintiffs -- and their special expertise on this subject -- out of the schools.

The documents obtained from New Rochelle were clearly within the control of Guardian and Thurnau.  They were intentionally withheld from production during discovery and then withheld by New Rochelle for ten months – until after the Court issued its ruling granting summary judgment.  These documents are highly relevant and support Plaintiffs allegations of a conspiracy to use cooperative bids to keep Plaintiffs out of the schools and eventually to drive them out of business altogether.  They illustrate how the conspiracy works and, at a minimum, raise material issues of fact as to Plaintiffs' claims.  To win on summary judgment, Thurnau testified, under penalty of perjury, that he "never took action to harm plaintiffs", "never conspired with anyone to harm plaintiffs", and attested that "[t]here is no factual basis for the claims against me." ECF 513 ¶¶ 82, 85, 88.  Petriello and Mucciolo both flatly denied that they "part of any conspiracy against Plaintiffs."  ECF 536, Exs. M ¶ 3 and N ¶ 3.  The documents withheld from production indicate otherwise.

For all of the reasons set forth below, Guardian and Thurnau and their counsel should be sanctioned for their misconduct in withholding these records and submitting false testimony to the Court.

**ARGUMENT**

I.       **SANCTIONS ARE APPROPRIATE UNDER RULE 37 AND RULE 11**

a.   **Rule 37 Sanctions**

Rule 26 of the Federal Rules of Civil Procedure provides that "[p]arties may obtain discovery by . . . deposition upon oral examination or written questions; written interrogatories; production of documents or things" and by other methods.  Fed. R. Civ. P. 26(a)(5).  The scope

14

of discovery authorized by Rule 26(a) includes 'any matter, not privileged, that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition and location of any books, documents or other tangible things and the identity and location of persons having knowledge of any discoverable matter.' Fed. R. Civ. P. 26(b)(1)." In re September 11th Liab. Ins. Coverage Cases, 243 F.R.D. 114, 124 (S.D.N.Y. 2007).

"The duty to disclose that arises under Rule 26 does not terminate after the first responsive answer or production, but is a continuing obligation.  See Zubulake v. USB Warburg LLC, 229 F.R.D. 422, 432-34 (S.D.N.Y. 2004). . . In particular, '[a] party is under a duty seasonably to amend a prior response to an interrogatory, request for production, or request for admission if the party learns that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.'  Fed. R. Civ. P. 26(e)(2)." In re September 11th Liab. Ins. Coverage Cases, 243 F.R.D. at 124.

Because discovery is run largely by attorneys, "the court and the judicial process depend upon honesty and fair dealing among attorneys.  Thus the court may impose appropriate sanctions on a party that, without substantial justification, fails to disclose information required by Rule 26(a) or 26(e)(2).  See Fed. R. Civ. P. 37(c)(1).  A failure to disclose under Rule 37 encompasses both the destruction of evidence, or spoliation, and untimely production of documents and information required to be produced.  See Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99 (2d Cir. 2002).  The moving party bears the burden of showing that its adversary failed timely to disclose information required by Rule 26.  To meet this burden the moving party must establish '(1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the

evidence had 'a culpable state of mind'; and (3) that the missing evidence is 'relevant' to the

party's claim or defense." <u>Residential Funding</u>, 306 F.3d at 107 . . ." <u>In re September 11th Liab.</u>

<u>Ins. Coverage Cases</u>, 243 F.R.D. at 124-25 (emphasis added).

"To satisfy the first element of this test, the moving party must show that the respondent

breached its obligations, either as set forth in Rule 26, Fed. R. Civ. P., or as provided in court

orders regulating discovery.  The 'culpable state of mind' element is satisfied by a showing that

'a party has breached a discovery obligation . . .  through bad faith or gross negligence [or]

ordinary negligence.' <u>Residential Funding</u>, 306 F.3d at 113; <u>Design Strategy, Inc. v. Davis</u>, 469

F.3d 284, 296 (2d Cir. 2006) . . . With respect to the third element, a finding that a party

breached its discovery obligations in bad faith is sufficient to establish the relevance of untimely

produced or destroyed evidence as a matter of law; a finding that a party breached its obligations

through gross negligence is 'frequently' sufficient.  Where the breach of discovery obligations

was merely negligent, the term 'relevant' in the context of Rule 37 'means something more than

sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence' . . . The standard of

relevance also differs as between evidence that was destroyed and evidence that was untimely

produced. . . But where, as here, much of the evidence at issue was not destroyed by untimely

produced, an assessment of the relevance is possible.  In such cases, the negligent party should

sustain liability for breaching its discovery obligations where such breach causes injury, but the

moving party should not obtain a windfall for uncovering evidence that would have made little

difference." <u>In re September 11th Liab. Ins. Coverage Cases</u>, 243 F.R.D. at 125.

Applying these principles here, counsel for Tri-State and Guardian clearly had a duty

under Rule 26 to produce all price quotes, purchase order, invoices, etc. for the "installation,

inspection, maintenance, repair of and staff training for folding partitions and/or safety systems."

They also had a duty to produce "[a]ll documents related to and communications with or concerning . . . EDS Bid #17." And, they had a duty to produce "[a]ll communications with and documents that refer or relate to Carl T. Thurnau." Likewise, Thurnau had an obligation to produce "[a]ll documents related to and communications with or concerning . . . EDS Bid No. 17.". Daniels Decl. Ex. 36. All parties had a duty to supplement their production and correct the errors in their testimony as soon as additional responsive documents became available. Fed. R. Civ. P. 26(e)(2). The price quotes, purchase orders, invoices and correspondence obtained from New Rochelle pursuant to Plaintiffs' FOIL request were clearly within Guardian and Thurnau's control and yet they never produced them. Accordingly, the first element of the Rule 37 analysis is satisfied.

With respect to the second element, a culpable state of mind, Petriello and Thurnau were well aware of the existence of these records and their relevance to Plaintiffs' case. And, it is simply not credible that counsel for Thurnau and Guardian did not know about the existence documents, especially after counsel for Plaintiffs specifically inquired about them during Petriello's deposition. It is more likely that the Defendants' purposefully withheld them or deliberately ignored their duty to search the records in order to win summary judgment. The Defendants' culpable state of mind is further evidenced by the fact that New Rochelle delayed for ten months – until well after the Court had granted summary judgment – to fully respond to Plaintiffs' FOIL request. Daniels Decl. Ex. 19. Even then Thurnau sought to muddy the waters by telling district officials responding to the FOIL request that the bid used to remove the partitions was administered by ESBOCES when there is no such bid. Daniels Decl. Ex. 25. The Defendants were bound and determined to prevail on summary judgment and it was, therefore, important that this evidence remain hidden from Plaintiffs and the Court.

With respect to the third element, relevance to Plaintiffs' case, there can be no doubt that the documents from New Rochelle were highly relevant to Plaintiffs' case. They provide probative evidence of the conspiracy to use cooperative bids to cut Plaintiffs out of the competitive bidding process and they establish Thurnau's direct role in the conspiracy. At a minimum, they raise triable issues of fact that would have precluded summary judgment.

In sum, Plaintiffs have satisfied the three part test for determining that sanctions under Rule 37 are appropriate. Accordingly, sanctions should be imposed in the amount set forth below, jointly and severally on Guardian and Thurnau or as the Court may otherwise deem appropriate under the circumstances. Doug's World Clocks.com Pty. Ltd. V. Princess Int'l, Inc., 323 F.R.D. 167, 176 (S.D.N.Y. 2017).

### b. Rule 11 Sanctions

"Rule 11 of the Federal Rules of Civil Procedure governs the conduct of attorneys in connection with their representations to the court, whether by signing, filing, submitting, or later advocating a pleading, written motion, or other paper. Fed. R. Civ. P. 11(b). Rule 11 provides that an attorney shall not make any representation to the court for any improper purpose, such as to harass or cause unnecessary delay or needless increase in the cost of litigation. Fed. R. Civ. P 11(b)(1); that an attorney shall not assert claims, defenses, or other legal contentions unless warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law, Fed. R. Civ. P. 11(b)(2); that an attorney shall not make allegations and other factual contentions without evidentiary support unless, if specifically so identified, such contentions are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery, Fed. R. Civ. P. 11(b)(3); and

similarly, that an attorney shall not deny factual contentions unless the evidence warrants such denials or unless, if specifically so identified, such denials are based on a lack of information or belief, Fed R. Civ P. 11(b)(4)." In re September 11th Liab. Ins. Coverage Cases, 243 F.R.D. at 123-24.

"By signing, filing, or otherwise representing to the Court that something is or is not so, the attorney certifies that he has complied with each of the foregoing obligations to the best of his knowledge, information, and belief, formed after an inquiry reasonable under the circumstances.  If, after notice and an opportunity to respond, the court determines that an attorney has not complied with his obligations set forth in Rule 11(b), it may impose an appropriate sanction on the attorney, law firm, or party that violated or is responsible for the violation.  Fed. R. Civ. P. 11(c)."  In re September 11th Liab. Ins. Coverage Cases, 243 F.R.D. at 124.

"'The standard for triggering the award of fees under Rule 11 is objective unreasonableness, and is not based on the subjective beliefs of the person making the statement.' Storey v. Cello Holdings, LLC, 347 F.3d 370, 387 (2d Cir. 2003) (citations omitted). 'With regard to factual contentions, sanctions may not be imposed unless a particular allegation is utterly lacking in support.' Id. at 388 (citations omitted).  With regard to legal contentions, sanctions may not be imposed unless a particular contention is 'patently contrary to existing law, especially as it existed at the time the papers were signed.' Id. at 391; see also Rodick v. City of Schenectady, 1 F.3d 1341, 1350 (2d Cir. 1993)." In re September 11th Liab. Ins. Coverage Cases, 243 F.R.D. at 124.

Counsel for Guardian and Thurnau violated Rule 11 by withholding highly relevant documents regarding the misuse of cooperative bids for SAFE PATH work by their clients in

New Rochelle.  Tri-State did the same in Lindenhurst and OESJ. Daniels Ex. 29, 30.  As in Qualcomm, it is simply not credible that counsel for Thurnau and Guardian did not know about the existence these documents following Petriello's deposition.  If they didn't have actual knowledge of the existence of the purchase orders, they deliberately ignored the likelihood that documents responsive to Plaintiffs' demands were located in New Rochelle and in other locations were Guardian performed "inspection and repair" services on SAFE PATH Systems.  As mentioned previously, the purchase orders cited EDS Bid No. 17 and other documents obtained from New Rochelle raise issues of material fact and should have precluded the Defendants from moving for summary judgment on the unfair competition, tortious interference and conspiracy claims in this case.  Counsel for Guardian and Thurnau compounded the Rule 11 violation by allowing their clients to submit false testimony to the Court about the misuse of EDS Bid #17.

Even though New Rochelle is not a party, counsel for Thurnau was aware from Petriello's deposition testimony that Thurnau personally hired Guardian to provide SAFE PATH services in New Rochelle.  Daniels Decl. Ex. 5 at 75.  The documents were clearly in Thurnau's control and Thurnau and his counsel had an obligation to ensure that these records were searched and produced.  There can be no doubt that counsel for Guardian had a duty to search for and produce these records.  Judge Peck reminded the parties on several occasions that it is not enough for a lawyer to simply ask for assurances from a client as to whether an exhaustive search for responsive documents has been made.  Counsel must go to the location where the information is actually maintained and search the records themselves.  Qualcomm, Inc. v. Broadcom Corp., drove this point home for the entire legal community in 2008.  In that case, the court ordered Qualcomm to reimburse Broadcomm for all of its costs and attorneys' fees ($8.5 million) for

withholding relevant emails from discovery in order to win the case.  Qualcomm, Inc. v. Broadcomm Corp., 2008 U.S. Dist. LEXIS *911 (S.D. Cal. Jan. 7, 2008), vacated, in part, and remanded on other grounds, Qualcomm v. Broadcomm Corp., 2008 U.S. Dist. LEXIS 16897 (S.D. Cal. March 5, 2008).  The court found that Qualcomm and its attorneys engaged in "aggravated litigation abuse" and the "calculated orchestration of a deliberate plan to conceal evidence" by failing to produce responsive documents.  Qualcomm, Inc. v. Broadcom Corp., 539 F. Supp. 2d 1214, 1242 (S.D. Cal. 2007).  The same is true here.  Guardian, Thurnau and their counsel engaged in a calculated, orchestrated and deliberate effort to conceal evidence of their conduct so they could win summary judgment. [10]

---

[10] Plaintiffs also take this opportunity to remind the Court that, as part of their joint defense, the Defendants also submitted a report prepared by Jeffrey D. Zwirn, a burglar and fire alarm system expert, that purported to be an analysis of two SAFE PATH Systems located in two Manhattan schools.  ECF 520.  The report, which was prepared at the request of the New York State Attorney General's Office, counsel for Carl Thurnau, was in fact an analysis of two safety devices that were not SAFE PATH installations.  The Defendants sought to hide this fact (and the identities of the NYCDOE employees involved in selecting the sites) by withholding the photographs and videos taken on the locations by Zwirn during the course of preparing his report.  Plaintiffs learned about the photographs and videos during Zwirn's deposition and demanded their production.  The Attorney General's Office refused to comply and Plaintiffs were forced to asked the Court to compel production, which it did on February 13, 2018.  ECF 556.  The photographs and video confirm that the safety devices analyzed by Jeffrey Zwirn were not SAFE PATH.  ***They were non-compliant safety systems installed by someone else.***  The

It was objectively unreasonable for counsel for Guardian and Thurnau to fail to produce the records from New Rochelle and then argue to the Court that Plaintiffs lacked any evidence to support its claims.  Therefore, sanctions under Rule 11 are also appropriate and counsel for Thurnau and Guardian should be jointly and severally liable for them.

### c.  <u>Amount of Sanctions</u>

#### i.  <u>Rule 37</u>

"Upon finding that the moving party has carried its burden under Rule 37, Fed. R. Civ. P., the court should endeavor to impose a sanction that will restore the parties to the position they would have occupied but for the breach of discovery obligations and deter future misconduct. <u>See</u>, <u>Zubulake</u>, 229 F.R.D. at 437.  Appropriate sanctions may include 'payment of reasonable expenses, including attorney's fees, caused by the failure' to disclose. Fed. R. Civ. P. 37(c)(1)." <u>In re September 11th Liab. Ins. Coverage Cases</u>, 243 F.R.D. at 131.  The court may, among other things,  also inform the jury of the party's failure, strike the respondents' pleadings in whole or

---

Zwirn report was a set-up designed to make Plaintiffs look incompetent, when in fact they are the industry leaders.  Much of what is said in the report regarding SAFE PATH maintenance is contradicted by the advice Zwrin gives to the industry in his book, *The Alarm Science Manual*, where Zwrin repeatedly stresses the importance of training and preventative maintenance to avoid fatal mistakes.  Daniels Decl. Ex. 18.  This too is part of defense counsels' deliberate and coordinated plan to abuse the discovery process to ensure that the case gets dismissed.  Safety devices, preventative maintenance and proper training is no idle matter.  There have already been two fatalities in New York and another recently in Virginia in May of 2018.  Daniels Decl. Ex. 33.  Plaintiffs are aware of at least a dozen serious injuries or deaths in other states.

in part, dismiss the action or proceeding in whole or in part, render default judgment against the disobedient party or impose other appropriate sanctions under the circumstances.  Fed. R. Civ. P 37(c)(1) and 37(b)(2)(A)(i)-(iv).

It is not possible to restore the parties to the position they would have occupied but for the breach of discovery obligations because Plaintiffs' case has been dismissed.  Plaintiffs have been deprived of the opportunity to prove to a jury that but for the tortious conduct of the Defendants, their proposals to maintain and repair SAFE PATH Systems and provide the state-mandated staff training would have been accepted in New Rochelle and many other districts like it. Plaintiffs have expended considerable resources to prosecute this action and reimbursement of those expenditures would at least restore Plaintiffs to the position they were in before they sought judicial intervention.  It would also serve to deter future misconduct by other litigants seeking to cover up their misconduct by withholding records and submitting false testimony to the Court.  To this end, Plaintiffs seek as sanctions reimbursement for their legal fees and costs estimated at approximately $800,000.  Qualcomm, Inc. v. Broadcomm Corp., 2008 U.S. Dist. LEXIS *911 (S.D. Cal. Jan. 7, 2008) (ordering Qualcomm to reimburse Broadcom for all of its attorneys' fees and costs in the amount of $8.5 million for withholding relevant evidence). Guardian, Tri-State and Thurnau are all responsible and should be held jointly and severally liable for reimbursement of Plaintiffs' attorneys fees and costs.  Doug's World Clocks.com Pty. Ltd. V. Princess Int'l, Inc., 323 F.R.D. 167, 176 (S.D.N.Y. 2017).

### ii.  Rule 11

"A sanction imposed for violation of Rule 11 'shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated.' Fed R. Civ. P. 11(c)(2).  If the sanctions are imposed pursuant to a party's motion, and if 'warranted for

effective deterrence,' the court may direct 'payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation.' Id.  A sanction must be proportioned to the public interest in the affected proceedings, and bear relation to the amounts involved."  In re September 11th Liab. Ins. Coverage Cases, 243 F.R.D. at 129.

Here, public interest in a fair adjudication of this case is extremely high.  The integrity of the judicial process, public safety in schools and the integrity of the competitive bidding process for public school work are all stake.  To deter a repetition of the highly unethical conduct of defense counsel and to deter comparable conduct by others similarly situated, Plaintiffs should be reimbursed for their attorneys' fees and expenses incurred in this litigation as set forth above. The Attorney General's Office, which represented Carl Thurnau, is equally at fault and should be jointly and severally liable for the sanctions.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs motion for sanctions should be granted.

Dated:  July 24, 2019
      New York, New York

Respectfully submitted,

*Katherine J. Daniels*

_____
Katherine Daniels, Esq.
KATHERINE DANIELS LLC
60 June Road, Suite 202
North Salem, New York 10560
Tel: (914) 886-8198
E-mail:
KDaniels@katherinedanielsllc.com

*Attorneys for Plaintiff Gym Door Repairs, Inc. and Safe Path Systems, LLC*

Eric Su, Esq.
*Of Counsel*

24